### KLEIER ADVERTISING, INC., & Kleier Marketing, Inc., Plaintiffs/Appellants,

v.

### PREMIER PONTIAC, INC.; Bill Stokely, dba Stokely Outdoor Advertising and Sign Company; and Stokely Outdoor Advertising Inc., Defendants/Appellees.

No. 88–2293.

United States Court of Appeals, Tenth Circuit.

Dec. 12, 1990.

Jack A. Wheat of Roach Becker & Wheat, Louisville, Ky., for plaintiffs/appellants.

Mark G. Kachigian, Tulsa, Okl., (Paul B. Naylor, David Tracy of Naylor & Williams, Inc., and Stephen L. Wilkerson of Knight, Wagner, Tulsa, Okl., were on the briefs) for defendants/appellees.

Before BALDOCK and EBEL, Circuit Judges, and SAM, District Judge.[*]

SAM, District Judge.

This is a suit for copyright infringement, defamation and deceptive trade practices related to a Tulsa, Oklahoma automobile dealership's infringing use of a copyrighted advertising display.

On the copyright infringement claim, the jury returned a verdict for plaintiffs-appellants Kleier Advertising, Inc. and Kleier Marketing, Inc. (together Kleier) and against defendants-appellants Charlie Lister and Premier Pontiac, Inc. d/b/a Lister Pontiac (Lister Pontiac) and Bill Stokely and Stokely Outdoor Advertising, Inc. (Stokely, Inc.). The trial court dismissed Kleier's defamation claim by summary judgment and its deceptive trade practices claim by directed verdict. Kleier asserts on appeal that the trial court erred by: (1) interpreting the jury verdicts as (a) awarding Kleier a single amount against all defendants for lost license fees, and (b) not awarding Kleier the amount of Stokely, Inc.'s profits from infringement; (2) holding as a matter of law that prejudgment interest is not recoverable in copyright infringement actions; (3) granting the defendants summary judgment on the defamation claim; and (4) entering a directed verdict for the defendants on the deceptive trade practices claim.

Our jurisdiction over this case arises under 17 U.S.C. § 101 *et seq.* (1982) (Copyright Act), 15 U.S.C. § 1051 *et seq.* (1982) (Lanham Act) and 28 U.S.C. § 1332 (1982)

(diversity of citizenship). We hold the trial court did not commit reversible error in interpreting the jury verdicts or dismissing the defamation and deceptive trade practices claims. We further hold the trial court erred by refusing to grant Kleier prejudgment interest on its copyright infringement claim.

Accordingly we affirm in part, reverse in part and remand with instructions regarding addition of prejudgment interest to Kleier's award.

I.

Kleier is comprised of agencies that create and place advertisements in various media, with a specialty in automobile dealership advertising. The agencies annually license advertising programs to Kleier's clients at rates related in part to the licensee's geographical location.

This litigation centers on Kleier's syndicated advertising program that captions trouserless cartoon characters wearing boxer shorts with "We'll Beat the Pants Off Any Deal!" The program is used primarily for billboards to which are attached scaffolding supporting a life-size mannequin that appears to be a billboard company employee engaged in posting the advertising display. The mannequin is wearing a hardhat and workclothes, and its trousers are dropped to the ankles exposing loudly colored boxer shorts. Kleier obtained copyrights on the entire "Beat the Pants" advertising program.

Various trial exhibits (including national publications) show that since its creation in 1982, the "Beat the Pants" program has been a traffic-stopping success in forty geographical markets throughout the United States and Canada.

To obtain a license to use Kleier's "Beat the Pants" program, an automobile dealership must pay Kleier an upfront license fee that entitles the licensee to use the program for one year within the dealership's marketing area, with the right to renew for another year for fifteen percent of the initial license fee. In the Tulsa market the

---

[*] Honorable David Sam, United States District Judge for the District of Utah.

initial fee is $14,887.00 and the renewal fee is $2,233.05.

In December 1984 Lister Pontiac, a Tulsa automobile dealership owned by Charlie Lister, started using billboard advertising with the slogan, "We'll Beat the Pants Off Any Deal in Town." Affixed to Lister Pontiac's billboard was scaffolding and a trouserless mannequin in boxer shorts wearing the same type of clothing and in the same working posture as the Kleier mannequin. Stokely, Inc., a Tulsa advertising agency owned by Bill Stokely, displayed Lister Pontiac's billboard. Kleier alleges Lister Pontiac's use of the billboard display was an infringement of Kleier's copyright, for which Stokely unlawfully earned $16,500.00 during the 22–month period Lister Pontiac's billboard was exhibited.

After Kleier's discovery of the Lister Pontiac billboard, Kleier and its counsel notified Lister Pontiac and Stokely, Inc. that they were infringing Kleier's copyright. Lister Pontiac and Stokely, Inc. initially responded by inquiring whether they could purchase a license, but later discarded Kleier's answer to the inquiry and never contacted Kleier again.

Kleier then commenced this copyright infringement action against Charlie Lister, Lister Pontiac, Bill Stokely and Stokely, Inc. The defendants raised the affirmative defense that any similarity between the two advertising displays was merely coincidental because Charlie Lister or Bill Stokely had designed all Lister Pontiac advertising displayed on Stokely, Inc.'s billboards. At trial Kleier introduced evidence showing that at least six other Stokely, Inc. displays were copies of advertising campaigns created by various agencies.

During the course of the litigation, Kleier amended its complaint to add claims for defamation and deceptive trade practices based on an article that appeared in the *Tulsa World*, a local newspaper. The article first discussed Kleier's national success with and alleged copyright of the "Beat the Pants" program and Kleier's claim that Stokely, Inc. copied the proofs Kleier sent it. The article then quoted Bill Stokely as saying: (1) Kleier had sent the proofs five months after Stokely, Inc. had put up the first Lister Pontiac billboard, (2) Kleier copied Stokely, Inc., and (3) he thought the program was Stokely, Inc.'s idea.

The trial court granted the Stokely defendants summary judgment on the defamation claim and entered a directed verdict for them on the deceptive trade practices claim. On the remaining claims, the jury returned verdicts against all defendants, finding they intentionally engaged in copyright infringement.

Kleier appeals from the trial court's orders (1) interpreting the verdicts, (2) denying prejudgment interest, (3) granting summary judgment on the defamation claim and (4) directing the verdict on the deceptive trade practices claim.

## II.

■ Kleier asserts it sought and was entitled to a jury award of damages plus profits, that is, the actual damages that resulted from the license fees the Lister defendants should have paid (evidenced as $17,120.05 representing licensure for one year and a one-year renewal) plus Stokely, Inc.'s profits from the infringing billboard display (evidenced as $16,500.00). Instead the jury returned verdicts (on identical verdict forms) against all defendants in the amount of $17,120.05.

The trial court denied Kleier's motion that requested entry of judgment of $17,120.05 against the Lister defendants and $16,500.00 against the Stokely defendants, for a total of $33,620.05. Kleier then moved unsuccessfully for judgment NOV or new trial, arguing that because the difference between damages and profits was small, the jury must have intended to award profits but instead awarded a slightly higher figure that could be remitted to the $16,500.00 profits figure. Rejecting Kleier's argument, the trial court said that although, under 17 U.S.C. § 504(b) (1982), the jury could have made a separate award in the amount of Stokely, Inc.'s profits, the jury obviously chose to award only the amount of the lost license fee, for a total

verdict of $17,120.05 against all defendants, jointly and severally. Order dated June 3, 1988, 698 F.Supp. 851, 851–52.

A motion for judgment NOV is to be analyzed as follows:

The standard for determining whether to grant a Motion for a judgment NOV ... is not whether there is literally no evidence to support the party opposing the motion, but whether there is evidence upon which the jury could properly find a verdict for that party.... [The trial court] must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence.

*Graham v. Wyeth Laboratories, Div. of Am. Home Prod. Corp.,* 906 F.2d 1399, 1401 (10th Cir.1990) (quoting *Brown v. McGraw–Edison Co.,* 736 F.2d 609, 612–13 (10th Cir.1984)).

We agree with the trial court and Kleier that 17 U.S.C. § 504(b) entitles Kleier to an award in the amount of Stokely, Inc.'s profits from the infringing display and that a damages-plus-profits award would not have constituted "double recovery" unless the profits figure included an amount also awarded as actual damages.[1] However, we also agree with the trial court that, after hearing all the evidence and being fully instructed on the actual and profits damages,[2] the jury chose to award (in actual damages) the amount of the lost license fee, $17,120.04, as the total verdict against the defendants, jointly and severally. To conclude otherwise would be to substitute

our judgment for the jury's verdict (which the trial court properly refused to do itself) or to create a double recovery because $17,-120.05 was clearly the amount proven in actual damages.

### III.

■ The trial court denied Kleier's request (in its motion for entry of judgment) for an award of prejudgment interest on the verdict, by adopting what the court considered the majority view that prejudgment interest is not recoverable under the Copyright Act, because the Act does not expressly provide for it. *See, e.g., Blackman v. Hustler Magazine, Inc.,* 620 F.Supp. 792, 802 (D.D.C.1985); *Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Constr. Co.,* 542 F.Supp. 252, 264 (D.Neb. 1982); *Baldwin Cooke Co. v. Keith Clark, Inc.,* 420 F.Supp. 404, 409 (N.D.Ill.1976).

The standard of review related to prejudgment interest is set out in *U.S. Industries, Inc. v. Touche Ross & Co.,* 854 F.2d 1223, 1255 (10th Cir.1988) (citation omitted): "The decision whether or not to allow prejudgment interest rests within the sound discretion of the trial court. Accordingly, the standard of review on appeal is whether the trial court abused its discretion in awarding—or in declining to award—prejudgment interest."

The question whether prejudgment interest may be awarded under the Copyright Act is one of first impression in this Circuit. We answer "yes" for reasons set out in these recent Seventh and Ninth Circuit decisions which hold that prejudgment in-

---

**1.** 17 U.S.C. § 504(b) provides in part: "The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages...." *See* H.R.Rep. No. 1476, 94th Cong., 2d Sess. 161, *reprinted in* 1976 U.S. Code Cong. & Admin.News 5659, 5777 ("[I]n cases where the copyright owner has suffered damages not reflected in the infringer's profits, or where there have been profits attributable to the copyrighted work but not used as a measure of damages, subsection (b) authorizes the award of both.").

**2.** *Instruction 22* reads in part: "Under the law, copyright owners are entitled to recover the

actual damages suffered by them as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."

*Instruction 21* reads: "Actual damages are defined to mean any injury incurred by plaintiffs from a defendant's wrongful use of plaintiff's advertising material. In this regard, you may take into consideration any profits that plaintiffs would have realized from selling the advertising to a defendant or any other user in the Tulsa marketing area. The sum should approximate the 'value of the exclusive use' of plaintiffs' advertising material."

terest may be awarded on claims for copyright violations: *Frank Music Corp. v. Metro–Goldwyn–Mayer Inc.*, 886 F.2d 1545 (9th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990), and *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431 (7th Cir. 1989).

*Frank Music*, 886 F.2d at 1550, and *Gorenstein*, 874 F.2d at 436, acknowledge that the Copyright Act does not provide for prejudgment interest; however, both cases cite decisional law supporting the award of such interest on federal claims even where the governing statute is silent on the issue. *See, e.g., West Virginia v. United States*, 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987); *Rodgers v. United States*, 332 U.S. 371, 373, 68 S.Ct. 5, 6, 92 L.Ed. 3 (1947). Expressly rejecting the argument that Congress did not intend to allow an award of prejudgment interest under the Act,[3] *Frank Music* held that prejudgment interest is necessary to compensate a copyright plaintiff fairly. *Frank Music*, 886 F.2d at 1552; *see also Loeffler v. Frank*, 486 U.S. 549, 108 S.Ct. 1965, 1970–71, 100 L.Ed.2d 549 (1988); *Rodgers*, 332 U.S. at 373, 68 S.Ct. at 6; *Miller v. Robertson*, 266 U.S. 243, 258, 45 S.Ct. 73, 78, 69 L.Ed. 265 (1924). "Prejudgment interest compensates the injured party for the loss of the use of money he would otherwise have had." *Frank Music*, 886 F.2d at 1550 (citing *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655–56, 103 S.Ct. 2058, 2062–63, 76 L.Ed.2d 211 (1983); *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1299–1300 (9th Cir.1984)); *Touche Ross*, 854 F.2d at 1256 ("Under federal law, the rationale underlying an award of prejudgment interest is to compensate the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of judgment."). *Frank Music* adds

that deterrence of infringement is also a benefit derived from prejudgment interest on copyright claims:

> Profits are awarded to the plaintiff not only to compensate for the plaintiff's injury, but also and primarily to prevent the defendant from being unjustly enriched by its infringing use of the plaintiff's property. *See Sheldon v. Metro–Goldwyn Pictures Corp.*, 309 U.S. 390, 399 [60 S.Ct. 681, 683, 84 L.Ed. 825] (1940); D. Dobbs *Handbook on the Law of Remedies* 1 (1973). For the restitutionary purpose of this remedy to be served fully, the defendant generally should be required to turn over to the plaintiff not only the profits made from the use of the property, but also the interest on these profits, which can well exceed the profits themselves. *See* D. Dobbs, *supra*, at 169–70.

*Frank Music*, 886 F.2d at 1552; *see also Gorenstein*, 874 F.2d at 436 (without prejudgment interest compensation of plaintiff is incomplete and defendant has incentive to delay).

We agree with *Frank Music* that it would be "anomalous" to hold that a plaintiff would be entitled to recover profits flowing from infringement but not revenue generated by the *use* of the profits. *Frank Music*, 886 F.2d at 1552. Consequently the trial court abused its discretion by denying Kleier prejudgment interest on its copyright claims. Indeed *Gorenstein* goes so far as to state the trial court would abuse its discretion by not awarding prejudgment interest where infringement is flagrantly deliberate, as it appears to be in this case. *Gorenstein*, 874 F.2d at 435.

For these reasons we pronounce the rule that prejudgment interest is available to plaintiffs under the Copyright Act. This pronouncement comports with our earlier

---

**3.** The *Frank Music* defendants argued that the congressional intent not to award prejudgment interest on copyright claims is clear from the fact that the Patent Act, 35 U.S.C. § 284 (1982), expressly allows prejudgment interest but the Copyright Act does not, even though the Acts' purposes are similar. Rejecting that argument, the Court noted that prejudgment interest was awarded in patent cases long before amendment

provided for it. *Frank Music,* 886 F.2d at 1550–51.

The Court further noted that "'Ordinarily "Congress' silence is just that—silence." '" *Id.* at n. 8 (quoting *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 2177, 104 L.Ed.2d 811 (1989) (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686, 107 S.Ct. 1476, 1481, 94 L.Ed.2d 661 (1987))).

**1042**

decision that "under federal law prejudgment interest is ordinarily awarded, absent some justification for withholding it." *Touche Ross*, 854 F.2d at 1256; *see also Gorenstein*, 874 F.2d at 436 (prejudgment interest presumptively available on all federal claims). Consequently this case must be remanded for addition of prejudgment interest to the verdict.[4]

## IV.

■ Kleier asserts the trial court erred by granting Stokely, Inc.'s motion for partial summary judgment against Kleier's defamation claim, which claim is based on the following article that appeared in the *Tulsa World*, a local newspaper:

'Pants' Slogan User Buckles Down

Billboard businessman Bill Stokely claims a copyright infringement lawsuit filed against him Monday is a real kick in the pants.

Tuesday, he vowed he'd file his own lawsuit before he'd get cuffed around in court for using the slogan: 'We'll Beat the Pants Off any Deal in Town.' Kleier Advertising Inc. of Louisville, Ky., claims in its U.S. District Court petition that it copyrighted the slogan several years ago and that the pants ad campaign, on behalf of several clients, has received national exposure in 'People,' 'Toyota Today,' and 'Automotive News' magazines.

Stokely claims he put up his first billboard using the slogan on behalf of Lister Pontiac in December 1984.

Kleier claims it sent Stokely proofs of the ad campaign and that Stokely appropriated the program for its own use.

'They approached me with the proofs on April 24, 1985, five months after we'd put up the first billboard. I didn't respond [to the letter],' Stokely said, adding he later received another letter, in February, from Kleier lawyers asking him to stop using the slogan.

*'They copied us. This is a great example and illustrates the fact you can sue anybody for anything anytime. I feel like it was our idea. Since when do you copyright such a saying anyway. I've been saying I'd beat the pants off my competition for years.'*

Both Kleier and Stokely's campaigns features [sic] a mannequin in boxer undershorts with trousers dropped to its ankles.

. . . .

*'I think they [Kleier] are the ones caught standing with their pants down,'* Stokely said. 'This is dumb.'

(Emphasis added.) The trial court concluded that the emphasized statements were not defamatory on their face (not libel per se) and, therefore, Kleier was not entitled to recover because it did not plead special damages. In addition, the trial court found Stokely, Inc.'s statements were privileged under Okla.Stat. title 12, § 1443.1 (1981) and Restatement (Second) of Torts § 587 (1981).[5]

The standard of review for determining whether the trial court properly granted summary judgment is "whether the evidence is sufficient to create an issue for

---

**4.** "[A]n award of prejudgment interest under federal law is governed by a two-step analysis. First, the trial court must determine whether an award of prejudgment interest would serve to compensate the injured party. Second, when an award would serve a compensatory function, the court must still determine whether the equities would preclude the award of prejudgment interest." *Touche Ross*, 854 F.2d at 1257 (prejudgment interest awards should be governed by fairness).

Because there is no federal statutory interest rate on prejudgment interest, the rate imposed will be left to the trial court's discretion.

We note that *Gorenstein*, while intending not to "straitjacket" district judges, approved of the

trial court's allowing compound interest and suggested, for convenience, using the prime rate. *Id.* at 436–37. *Frank Music* suggested the fifty-two week Treasury bill rate, but left the final decision to the trial court because it was better able to weigh the equities involved with imposition of interest. 886 F.2d at 1552.

**5.** The court must decide as a matter of law whether a communication is privileged. *Crittendon v. Combined Communications Corp.*, 714 P.2d 1026, 1028 (Okla.1985) (trial court erred by submitting libel claim to jury) (quoting *Cobb v. Oklahoma Pub. Co.*, 42 Okl. 314, 140 P. 1079, 1081 (1914) (citing *Tuohy v. Halsell*, 35 Okl. 61, 128 P. 126 (1912))).

the jury." *Banghart v. Hollywood General Partnership*, 902 F.2d 805, 806–07 (10th Cir.1990); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986); *see also Black v. Hieb's Enters., Inc.*, 805 F.2d 360, 364 (10th Cir.1986).

We agree with the trial court that the statements are not defamatory or libelous per se, but do not agree that the statements were privileged under either the Oklahoma statute or the Restatement.

Regarding privilege, even a cursory reading of section 1443.1 shows that its legislative purpose is to protect First Amendment rights attached to all *official* reporting of any legislative or judicial proceedings.[6] *See, e.g., Crittendon v. Combined Communications, Corp.*, 714 P.2d 1026 (Okla. 1985) (television broadcast related to surgeon's performing unnecessary hysterectomy was privileged because it was accurate). There can be no serious argument that Bill Stokely's comments to the press amounted to "official reporting" even if, as the trial court pointed out, the statements merely reflected Stokely, Inc.'s affirmative defenses set out in pleadings that were public record.

Section 587 of the Restatement[7] is equally unhelpful to Kleier because the commentary indicates that the privilege extends only to communications made in court documents, attorney conferences and other matters officially related to court proceedings. *See* Restatement (Second) of Torts § 587 comment b (pre-complaint comments to civil and prosecuting attorneys or included in search warrant are privileged) and

comment c (statements in pleadings and other official court documents are also privileged); *see also, e.g., Pacific Employers Ins. Co. v. Adams*, 196 Okl. 597, 168 P.2d 105, 107 (1946) (medical statement *in pleadings* that plaintiff could not return to work because he had syphilis was absolutely privileged).

Moreover, the Oklahoma Supreme Court recently held that the trial court must not only examine whether allegedly defamatory statements had some relation to a judicial proceeding but also whether "the circumstances surrounding the communication or publication of the alleged defamatory statement had some relation to the proposed proceeding." *Kirschstein v. Haynes*, 788 P.2d 941, 951 (Okla.1990).

> This inquiry narrows the scope of the privilege much more than the relevancy inquiry and *turns to a large extent on determining to whom the publication was made.* A measure of protection is, thus, afforded to an alleged victim of defamation for *publication to the public at large* or to third parties unconnected with the proposed proceeding.

*Id.* (emphasis added) (footnote omitted). *Kirschstein* adds that privilege depends not only on the *content* but the *occasion* of the communication. *Id.* n. 26 (citing *Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 697–98 (8th Cir.1979)). "The privilege may be lost by unnecessary or unreasonable publication to one for whom the occasion is not privileged. Thus, *unnecessary publication to the news media may result in loss of the privilege*, as well as publication to those wholly unconnected with the judi-

---

**6.** Section 1443.1 states:
A privileged publication or communication is one made:
First. In any legislative or judicial proceeding or any other proceeding authorized by law;
Second. *In the proper discharge of an official duty;*
Third. By a fair and true report of any legislative or judicial or other proceeding authorized by law, or anything said in the course thereof, and any and all expressions of opinion in regard thereto, and criticisms thereon, and any and all criticisms upon the official acts of any and all public officers, except where the matter stated of and con-

cerning the official act done, or of the officer, falsely imputes crime to the officer so criticized.
(Emphasis added.)

**7.** Restatement (Second) of Torts § 587 reads:
A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.

cial process." *Kirschstein,* 788 P.2d at 951 n. 27 (emphasis added) (citation omitted) (citing *Asay,* 594 F.2d at 698; *Sullivan v. Birmingham,* 11 Mass.App.Ct. 359, 416 N.E.2d 528, 530–31 (1981)); *see also* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 114, at 820 (5th ed. 1984) (statements to newspapers concerning case not part of judicial proceeding and not absolutely privileged).

Here, Bill Stokely's statements not only were unrelated to any official judicial function but they were directed via news media to the public, an audience wholly unconnected to the judicial process. Consequently neither the content nor the occasion of the communications warrants absolute privilege under Oklahoma statute and the Restatement.

Concluding the statements are not privileged, we will now address whether they are defamatory on their face (libel per se). Civil libel is defined at Okla.Stat. title 12, § 1441 (1981):

> Libel is a false or malicious unprivileged publication by writing, printing, picture, or effigy or other fixed representation to the eye, which exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation. . . .

The Oklahoma Supreme Court has held that communications alleged to be defamatory and therefore libelous fall into three categories:

(1) Those not of defamatory meaning;

(2) Those reasonably susceptible of both a defamatory and innocent meaning (commonly referred to as libel per quod); and

(3) Those clearly defamatory on their face (commonly referred to as libel per se).

*Miskovsky v. Tulsa Tribune Co.,* 678 P.2d 242, 247 (Okla.1983) (citing *Fite v. Oklahoma Pub. Co.,* 146 Okl. 150, 293 P. 1073 (1930)), *cert. denied,* 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984); *see also Akins v. Altus Newspapers, Inc.,* 609 P.2d 1263 (Okla.1977), *cert. denied,* 449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 467 (1980).

Whether an article is libelous per se is a question of law for the court rather than the jury to decide.[8] *Id.* at 247; *see also Nichols v. Bristow Publishing Co.,* 330 P.2d 1044, 1045 (Okla.1957) (citing *McKenney,* 141 P. at 780). " 'Per se' means by itself, and without innuendo." *Nichols,* 330 P.2d at 1045 (citing *Tulsa Tribune Co. v. Kight,* 174 Okl. 359, 50 P.2d 350, 353 (1935)).

The court must examine the *entire article* to determine whether it is libelous per se: " 'Language out of context may have a different meaning than the same language within the four corners of the [publication].' " *Miskovsky,* 678 P.2d at 247 (quoting *Winters v. Morgan,* 576 P.2d 1152, 1154 (Okla.1978)). Therefore libel per se will not be found unless by "fair construction" the article imputes to the plaintiff "fraud, deceit, dishonesty, or reprehensible conduct in its business. . . ." *Royer v. Stoody Co.,* 192 F.Supp. 949, 953 (W.D. Okla.1961) (trade libel case applying Oklahoma law) (quoting *National Ref. Co. v. Benzo Gas Motor Fuel Co.,* 20 F.2d 763, 771 (8th Cir.), *cert. denied,* 275 U.S. 570, 48 S.Ct. 157, 72 L.Ed. 431 (1927)); *see also Nichols,* 330 P.2d at 1045 (language used in a newspaper article which, when given its ordinary, natural, and obvious meaning, meets the elements of the Oklahoma statute is libelous per se and actionable) (citing *Dusabek v. Martz,* 121 Okl. 241, 249 P. 145 (1926); *Paramount Pictures, Inc. v. Leader Press, Inc.,* 106 F.2d 229 (10th Cir. 1939). To be libelous per se, the publication must lead a "reasonable person to foresee" it would have a "disparaging effect on another's property." *Paramount Pictures,* 106 F.2d at 231.

---

**8.** Should the trial court determine a communication is not libelous per se, the jury must decide whether the communication is libelous per quod. The jury need not reach that question, however, if the plaintiff does not plead special damages. *See, e.g., Miskovsky,* 678 P.2d at 247–48 (citing *Fite,* 293 P. at 1077; *McKenney v. Carpenter,* 42 Okl. 410, 141 P. 779, 780 (1914)); *Akins,* 609 P.2d at 1267.

The trial court concluded the publication was not libelous per se because (1) Bill Stokely's "statements were not made in context of uttering a fact, but rather as an expression of an opinion," and (2) "the statements were cushioned by words such as, 'I feel like it was our idea,' and 'I've been saying I'd beat the pants off my competition for years.' " Order dated November 17, 1987, at 3 (emphasis added). Kleier asserts the trial court erred by focusing only on portions of the article because the "gist" or "sting" of the entire article was libelous per se in that Bill Stokely accused Kleier of engaging in unethical activities such as plagiarism and fraud. Appellant's Reply Brief at 19.

The trial court cited no authority and we are aware of none for the proposition that a publication which, in the entire context, is libelous per se would be robbed of its sting merely because it is couched in the subjective. Without reaching that question, we conclude the publication was not libelous per se because of the following factors.

First, the article makes clear the nature of the lawsuit, that is, Kleier is suing Stokely, Inc. for copyright infringement, not vice-versa. The article further states that Kleier is an advertising company which allegedly copyrighted the advertising program several years ago and has enjoyed national success as well as press from it. It sets out Kleier's claims in the litigation (if not as colorfully as it sets out Stokely, Inc.'s, perhaps more credibly) that Kleier sent Stokely, Inc. the proofs of its "Beat the Pants" program and that Stokely, Inc. appropriated the program for its own use. The article also points out that both Kleier's and Stokely's ad campaigns feature a mannequin in boxer shorts with trousers dropped to its ankles.

Because Kleier's and Stokely, Inc.'s claims were both published (considering the context of the entire article), the publication did not, in our opinion, violate section 1441 by exposing Kleier to "public hatred,

contempt, ridicule or obloquy," which would "tend to deprive [it] of public confidence, or to injure [its] ... occupation."

Second, where the article reported both sides of the controversy, Bill Stokely's subjective remarks would lead the reasonable person to infer he is merely stating his position regarding the lawsuit. *Paramount Pictures*, 106 F.2d at 231. In that context the statements would not violate section 1441.

Third, while stopping short of holding that a humorous article could never be per se libelous, we conclude that, in context, the jocular tenor of this article with its numerous plays on "pants down" humor strips the publication of any sting, or perhaps kick, directed at Kleier. Indeed we believe that a fair construction, *Royer*, 192 F.Supp. at 953, of language "within the four corners of the publication," *Miskovsky*, 678 P.2d at 247; *Winters*, 576 P.2d at 1154, would leave the reasonable reader with an impression more favorable to Kleier than to Stokely, Inc.

Finally, contrary to Kleier's assertion, this case is easily distinguished from cases such as *Nichols* that contain none of the instant factors to balance the effect of the disparaging publication. *Nichols*, 330 P.2d 1044 (trial court erred by dismissing action because publication was libelous per se). There the non-humorous, one-sided article stated that Nichols attempted to destroy the value of a publishing plant after he profited from the sale of the plant. The appellate court held the publication tended to expose Nichols to public contempt and loss of confidence by characterizing his dealings as "shady" and "on the sneak" and implying that several local business firms refused to do business with him.[9] That sort of direct, unmitigated attack on Kleier's business scruples is simply not present here.

For these reasons, the trial court did not err by granting summary judgment on Kleier's defamation claim, because it ap-

---

**9.** The *Nichols* article reads in part: "[Nichols] later discovered that there was a large percentage of business firms in the city that did not enjoy doing business with organizations that openly operate with shady ethics. In recent years his publishing activities have been maintained on a sneak basis." *Id.* at 1045.

pears there was insufficient evidence to support a verdict that Stokely's statements were libelous per se under section 1441. *See Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512 (summary judgment appropriate where fair-minded jury could return a verdict for plaintiff on evidence presented). Because Kleier did not allege any special damages, the trial court properly granted Stokely, Inc.'s motion for partial summary judgment by dismissing Kleier's defamation claim.

## V.

■ Kleier contends the trial court erred by directing the verdict against Kleier on its unfair competition claims asserted under section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a), and the Oklahoma Deceptive Trade Practices Act, Okla.Stat. title 78, § 51 *et seq.* (1981).

Kleier claims unfair competition on the ground that Bill Stokely's statements in the *Tulsa World* deceived the public by creating the impression Stokely originated the mannequin display and slogan. As actual damages, Kleier sought $400.00 for corrective advertising that would occupy the same amount of space in the *Tulsa World* as did the story containing Stokely's statements.

After lengthy colloquy with both parties, the trial court concluded there was "not one iota of evidence" that Bill Stokely's statements affected Kleier's right to sell its "Beat the Pants" program in the Tulsa territory. Tr. 399–400. The trial court noted that although Kleier claimed the billboard adversely affected its business, the billboard no longer existed by the time Bill Stokely made the statements. Consequently the trial court granted Stokely's motion for a directed verdict, stating it simply didn't believe a jury could, on those facts, return a verdict for the plaintiff and against the defendant. Tr. 400.

The standard for reviewing a directed verdict is the same as for denial of a motion for judgment NOV: The trial court must determine "whether there is evidence upon which the jury could properly find a verdict" when viewing the evidence (and all

reasonable inferences from it) in favor of the party resisting the motion. *Graham,* 906 F.2d at 1401 (quoting *McGraw–Edison Co.,* 736 F.2d at 612–13). " '[T]he trial judge may grant a motion for directed verdict only when all reasonable inferences to be drawn from the evidence are so in favor of the moving party that reasonable persons could not differ in their conclusions.' " *Banghart,* 902 F.2d at 807 (quoting *FDIC v. Palermo,* 815 F.2d 1329, 1335 (10th Cir. 1987) (citing *Hidalgo Properties, Inc. v. Wachovia Mortgage Co.,* 617 F.2d 196, 198 (10th Cir.1980))); *see also McKinney v. Gannett Co.,* 817 F.2d 659, 663 (10th Cir. 1987) (motion for directed verdict should be denied if reasonable men could draw different inferences from facts).

Applying these standards, we conclude the trial court did not err by directing the verdict on Kleier's unfair competition claims. At 15 U.S.C.A. § 1117(a) (Supp. 1990), the Lanham Act limits a plaintiff's recovery to (1) defendant's profits, (2) plaintiff's damages and (3) the costs of the action. Section 54(a) of the Oklahoma Deceptive Trade Practices Act provides that actual damages need not be proven to obtain injunctive relief, but a plaintiff is entitled to actual damages if they are alleged and proven. Kleier did not seek injunctive relief below and, on appeal, cites to no proof in the record it incurred actual damages as a result of Bill Stokely's statement in the *Tulsa World.* Indeed it would seem actual damages would be difficult to prove where, as the trial court pointed out, the infringing billboard no longer existed when Bill Stokely made his statements. Consequently we conclude the trial court correctly directed the verdict against Kleier regarding deceptive trade practices, because Kleier presented no evidence on which the jury could have found in its favor on either the federal or state claim.

## VI.

We affirm the trial court's interpretation of the jury verdicts and dismissal of the defamation and deceptive trade practices claims. We reverse the trial court's denial of prejudgment interest on Kleier's copy-

right infringement claim, and remand for addition of prejudgment interest to the verdict at a rate to be determined at the discretion of the trial court.

AFFIRMED in part, REVERSED in part, and REMANDED with directions.