988 F.2d 122
 1993 Copr.L.Dec. P 27,068
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
SUBAFILMS, LTD.; The Hearst Corp.,
Plaintiffs-counter-defendants-Appellees,
v.
MGM-PATHE COMMUNICATIONS CO., fka MGM/UA Communications Co.
and as United Artists Corporation; MGM/UA Home Video, Inc.;
Warner Home Video, Inc., Warner Bros. Inc.,
Defendants-counter-claimants-Appellants.
SUBAFILMS, LTD.; The Hearst Corp., Plaintiffs-Appellants,
v.
MGM-PATHE COMMUNICATIONS CO., fka MGM/UA Communications Co.
and as United Artists Corporation; MGM/UA Home Video, Inc.;
Warner Home Video, Inc.; Warner Bros. Inc.; United
Artists Corporation, Defendants-Appellees.
 Nos. 91-56248, 91-56379 and 91-56289.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 2, 1992.
Decided Feb. 17, 1993.
 
 Appeal from the United States District Court For the Central District of California; No. CV-88-6626-JGD, John G. Davies, District Judge, Presiding.
 C.D.Cal.
 AFFIRMED.
 Before D.W. NELSON, CYNTHIA HOLCOMB HALL and RYMER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Subafilms, Ltd. ("Subafilms") and the Hearst Corporation ("Hearst") sued United Artists Corporation ("UA"), MGM-Pathe Communications Co. ("MGM/UA"), MGM/UA Home Video, Inc., Warner Bros., Inc., and Warner Home Video, Inc. (collectively "the Distributors") for copyright infringement under 17 U.S.C. § 101 et seq., breach of contract, and related state law claims. Defendants counterclaimed for breach of contract, tortious interference with contract, and fraud. The district court found in plaintiffs' favor and awarded damages, attorney's fees, and injunctive relief. Defendants appeal the decision; plaintiffs cross-appeal the denial of prejudgment interest. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm both the finding of copyright infringement and the relief ordered.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 3
 In 1966, Subafilms and Hearst (collectively "the Producer") entered into a joint venture to produce the animated Beatles film "Yellow Submarine" ("the Picture"). Hearst negotiated with UA to finance and distribute the Picture, and separate Distribution and Financing agreements ("the Agreements") were signed in May of 1967. This dispute concerns the grant of rights, the distribution term, and the post-distribution control provisions of the Agreements.
 
 
 4
 Pursuant to the Agreements, UA distributed the Picture in theaters beginning in 1968 and later on free television. In the early 1980's, UA entered into several agreements for the distribution of some of its films on videocassette. Over the Producer's objections, in 1987 MGM/UA distributed the Picture domestically through MGM/UA Home Video and granted international distribution rights to Warner Home Video.
 
 
 5
 The Producer brought the present suit against MGM/UA and Warner in late 1988. The case was tried before retired California Superior Court Judge Lester E. Olson ("the Special Master"), who ruled in favor of the Producer. The district court adopted all of the Special Master's findings and recommendations except the award of prejudgment interest. These timely appeals followed.
 
 STANDARD OF REVIEW
 
 6
 While the Special Master's findings of fact are reviewed for clear error, we do not defer to his conclusions of law. Swoboda v. Pala Mining, Inc., 844 F.2d 654, 656 (9th Cir.1988). Mixed questions of law and fact are reviewed de novo. Id.
 
 DISCUSSION
 I. Admission of Parol Evidence
 
 7
 The Special Master found that the Agreements were ambiguous and admitted parole evidence to explain their terms. Whether contract language is ambiguous is a question of law, subject to de novo review. See Petro-Ventures, Inc. v. Takessian, 967 F.2d 1337, 1339-40 (9th Cir.1992). Although New York retains a strict version of the parol evidence rule, this limitation applies only where the contract is unambiguous. See 67 Wall Street Co. v. Franklin Nat'l Bank, 333 N.E.2d 184, 186 (N.Y.1975). A provision "is ambiguous when it is reasonably susceptible to more than one reading." United States Fire Ins. Co. v. General Reinsurance Corp., 949 F.2d 569, 572 (2d Cir.1991) (applying New York law).
 
 
 8
 This dispute focuses on p 10 of the Distribution Agreement[1] and p 13 of the Financing Agreement.[2] The Special Master admitted parol evidence because "[t]here are portions of the agreements ... that are verbose, redundant, misleading and ambiguous." A de novo examination demonstrates that he was correct.
 
 
 9
 While each individual provision may appear to be unambiguous, any attempt to read the disputed provisions together raises serious questions. Do the distribution rights end after ten years, or do they continue until the Producer exercises the buy-or-sell option? Is there joint control after the distribution terms ends, or does UA have the "sole and exclusive distribution and exploitation rights"? Is there joint control over all rights in the Picture, or only over the original theatrical and television rights? Was UA granted rights to any new technology, or only to new developments in the theatrical and television areas? Since these questions are raised even by a cursory reading of the Agreements, we find that the Special Master did not err by admitting parole evidence.[3]
 
 
 10
 II. Disclosure of Privileged and Confidential Documents
 
 
 11
 After extensive briefing and oral argument, the Special Master granted plaintiffs' motion to compel production of documents which defendants claimed were protected by the attorney-client or work product privileges. Rulings regarding the application of attorney-client privilege are mixed questions of law and fact which are reviewed de novo. See Clarke v. American Commerce Nat'l Bank, 974 F.2d 127, 130 (9th Cir.1992).
 
 
 12
 The parties disagree as to whether these claims are governed by New York or California law. Under Fed.R.Evid. 501, "[W]ith respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege ... shall be determined in accordance with State law." But Rule 501 does not indicate which "State law" is to be applied. We need not determine which state law applied, however, because the result would be the same under the laws of both California and New York. See KL Group v. Case, Kay & Lynch, 829 F.2d 909, 918 (9th Cir.1987).
 
 
 13
 The party who asserts the attorney-client privilege in New York bears the burden of establishing (1) that an attorney-client relationship existed, and (2) that the communication to the attorney was confidential and made in order to obtain legal services or advice. N.Y.Civ.Prac.L. & R. 4503(a) (Consol.1992); Priest v. Hennessy, 431 N.Y.S.2d 511, 514 (1980). New York also has an "absolute" protection for attorney work product which extends to work prepared for other litigation. N.Y.Civ.Prac.L. & R. 3101; Beasock v. Dioguardi Enter., Inc., 499 N.Y.S.2d 560 (App.Div.1986). Again, the burden of satisfying each element of the privilege falls on the proponent. See John Blair Communications v. Reliance Capital Group, L.P., 582 N.Y.S.2d 720, 721 (App.Div.1992).
 
 
 14
 Under California law, lawyer-client communications are presumed to be confidential. Cal.Evid. Code § 917 (West 1966); see also Cal.Evid. Code §§ 952, 954 (West 1992). "However, the party claiming privilege has the burden to show that the communication sought to be suppressed falls within the terms of the statute." Alpha Beta Co. v. Superior Court, 203 Cal.Rptr. 752, 755 (Ct.App.1984); Liew v. Breen, 640 F.2d 1046, 1049 (9th Cir.1981) (applying California law). While California's absolute protection for attorney work product extends to "[a]ny writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories," Cal.Civ.Proc. Code § 2018(c) (West 1992), the proponent still has the burden of proving the essential elements of the privilege. BP Alaska Exploration, Inc. v. Superior Court, 245 Cal.Rptr. 682, 689 (Ct.App.1988).
 
 
 15
 Thus, under both New York and California law, the party asserting a privilege has the burden of proving the essential elements of that privilege. The Special Master found that defendants had "failed to meet their burden." On appeal, the Distributors have provided us with little more than bare assertions in support of their claim that the documents were privileged. They have not provided us with copies of the disputed documents, specific descriptions of the documents, or even a full listing of the documents. The Distributors have thus made no showing which establishes that their burden has been met, and we cannot say that the Special Master's ruling was clear error.
 
 III. Copyright Infringement
 
 16
 The district court found that the home video distribution infringed plaintiffs' copyright in the Picture under 17 U.S.C. § 101 et seq. The Distributors contend that they had home video distribution rights under the Agreements and, in the alternative, that their foreign distribution of these videocassettes is not actionable under the copyright laws of the United States. We reject both arguments.
 
 A. Interpretation of the contract
 
 17
 The application of principles of contract interpretation to a particular contract is an issue of law which we review de novo. See Petro-Ventures, 967 F.2d at 1340. "When the inquiry extends beyond the words of the contract and focuses on related facts, however, the trial court's consideration of extrinsic evidence is entitled to great deference and its interpretation of the contract will not be reversed unless it is clearly erroneous." Id.
 
 1. Grant of rights
 
 18
 The Special Master found, based on extrinsic evidence, that UA received only "theatrical" and "television" rights in the Picture. He noted the following: the drafter of the Agreements admitted that the basic deal was only for theatrical and television rights; the Producers deleted references to "non-theatrical rights" in the first draft, although MGM/UA had apparently (possibly in bad faith) left some of those references in; the owner of the musical recording rights had given the Producer only the rights to "theatrical and television exhibition"; and there was evidence that MGM/UA employees believed they did not own non-theatrical rights and could not license them to third parties. These conclusions were not clearly erroneous.
 
 
 19
 After hearing conflicting testimony about industry practice in the 1960s, the Special Master concluded that home video rights were properly characterized as non-granted "non-theatrical" rights. The Distributors argue that this misstates industry practice in the 1960's. They assert that home video should be treated as a separate category of rights, neither "theatrical" or "non-theatrical" in nature, because it is a completely new medium. In support of this, they cite Cohen v. Paramount Pictures Corp., 845 F.2d 851, 853-54 (9th Cir.1988). However, Cohen holds only that home video rights are not included in the category of television rights. Cohen contains no discussion of whether home video is or is not a "non-theatrical right."
 
 
 20
 In essence, the Distributors argue that the Special Master should have believed their qualified witnesses rather than adopting the "flimsy opinions" of plaintiffs' witnesses. The credibility of witnesses, however, is an area in which we give great deference to the trier of fact. In the absence of clear authority on the subject, the Special Master had both the opportunity to judge the witnesses' credibility and sufficient evidence to support his conclusions.
 
 2. The "future technology" clause
 
 21
 The granted rights include "the right to project, exhibit, reproduce, transmit and perform the Picture and prints and trailers thereof by television and by any other technological, mechanical or electronic means, method or device now known or hereafter conceived or created." The Special Master held that this "future technology clause" did not cover the later-developed home video market. The Distributors claim that, as a matter of law, the clause encompassed home video rights.[4]
 
 
 22
 The only guidance in this circuit comes from the Cohen case, which held that, in the absence of a future technology clause, "television" rights did not encompass home video rights. But Cohen does not state that a future technology clause will confer home video rights where the original rights are limited to theatrical and television rights. Cohen simply does not address this fact situation.
 
 
 23
 Relying on the testimony of the one of Hearst's negotiating attorneys, the Special Master found that the parties had agreed to "split" theatrical and non-theatrical new technologies. Once the Special Master found that non-theatrical rights had not been granted to UA, this distinction was a logical one. In the absence of a clear legal rule, these conclusions were not clearly erroneous.
 
 3. Distribution term
 
 24
 The provisions regarding the distribution term are particularly confusing. Both Agreements give MGM/UA distribution rights for a period of ten years after the Picture's first general release. Paragraph 13 of the Financing Agreement gives the parties "joint control" over "any ... disposition whatsoever" of the Picture upon expiration of the distribution term. After the distribution term, either party could invoke the "buy-or-sell" provision. However, "[n]otwithstanding anything to the contrary ... United's sole and exclusive distribution and exploitation rights" would continue unless and until the Producer exercised that option. The Special Master concluded that the "notwithstanding" provision logically could not have been intended to extend MGM/UA's distribution term beyond the specified ten years and found that a strict reading of the clause "would totally vitiate the express ten-year term for which the parties had negotiated." He found instead that the clause was intended to continue only UA's status as a distributor.
 
 
 25
 The Special Master also noted that the ten-year distribution term had been inserted in place of UA's original "in perpetuity" language, and that the "notwithstanding" provision had not been the subject of extensive discussion and resolution (unlike other provisions). Since MGM/UA had drafted the Agreements, he construed the language against them, and found no parole evidence to support MGM/UA's interpretation. Finally, he noted that the Financing Agreement was ancillary to the Distribution Agreement, and that it would have been unusual for an ancillary agreement to expand drastically the rights contained in the main agreement.
 
 
 26
 The Distributors assert that the "notwithstanding" clause is the governing provision. The Producer had the ability, by exercising the "buy-or-sell" option, to limit MGM/UA's distribution term to ten years; otherwise the term would continue indefinitely. The parties would have "joint control" in the sixty days after the Producer decided to exercise the "buy-or-sell" option. Because the Producer has not exercised the option, the Distributors claim that they continue to have exclusive distribution rights.
 
 
 27
 Although the Distributors argue otherwise, their interpretation of the "notwithstanding" provision leaves the ten-year term and the joint control provision almost meaningless. Furthermore, these terms are not patently subordinate to the "buy-or-sell" provision. The Producer also points to documents and testimony in which MGM/UA employees indicated, both internally and to third parties, that the right to distribute the Picture expired after ten years. The Special Master's interpretation gives meaning to all of the relevant provisions and does not reach the level of clear error.
 
 4. Joint control defense
 
 28
 The Distributors claim that they had a right to license home video rights under the joint control provision. Neither co-owners nor exclusive licensees may be sued for copyright infringement. See Oddo v. Ries, 743 F.2d 630, 632-33 (9th Cir.1984); United States Naval Inst. v. Charter Communications, Inc., 936 F.2d 692, 695 (2d Cir.1991). However, a licensee who exceeds the scope of the license may still be liable for infringement. See Oddo, 743 F.2d at 634.
 
 
 29
 The Distributors argue that the joint control provision unambiguously gives them joint control over all dispositions of the Picture. In addition to finding that they had only joint (rather than exclusive) control after the distribution term ended, however, the district court found that "joint control and the requirement of obtaining express prior written consent do not apply with respect to distribution rights in the motion picture which were not granted to" UA in the first place.
 
 
 30
 Given the limited grant of rights in the Distribution Agreement, it is unlikely that the Producer would have agreed to such a blanket expansion of rights after the distribution term. There are documents in the record which indicate that MGM/UA accepted this interpretation. Thus it was not clear error for the district court to find that the joint control provision did not enable MGM/UA to exploit home video rights in the Picture.
 
 
 31
 B. Liability for foreign distribution of videocassettes
 
 
 32
 The district court also held that Warner's international distribution constituted copyright infringement. The district court's conclusions of law are reviewed de novo, but its findings of fact are reviewed for clear error. Lewis Galoob Toys, Inc. v. Nintendo of America, Inc., 964 F.2d 965, 967 (9th Cir.1992).
 
 
 33
 Section 106 of the Copyright Act gives the copyright owner the exclusive rights "to do and to authorize" the reproduction, preparation of derivative works, distribution, performance and display of the copyrighted work. 17 U.S.C. § 106(1)-(5). "For the most part, acts of infringement which occur outside of the jurisdiction of the United States are not actionable" under the Act. 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 17.02 (1992). MGM/UA contends that its "authorization" of Warner does not constitute an infringement of § 106 rights because the Producer has no international rights in the Picture.
 
 
 34
 This case is controlled by Peter Starr Prod. Co. v. Twin Continental Films, Inc., 783 F.2d 1440 (9th Cir.1986). While "infringing actions that take place entirely outside the United States are not actionable" in federal court, we held that an "act of infringement within the United States" was alleged where the illegal authorization of international exhibitions took place in the United States. Id. at 1442, 1443.[5] Here, the Distributors agree that the "authorization" to distribute the Picture internationally on home video occurred in the United States. Because this act of illegal authorization occurred within the United States, Peter Starr compels the conclusion that a valid claim of copyright infringement has been raised. The district court did not err in finding for plaintiffs.
 
 V. Damages
 
 35
 A copyright infringer is liable for either "the copyright owner's actual damages and any additional profits of the infringer" or statutory damages. 17 U.S.C. § 504(a).
 
 
 36
 The copyright owner is entitled to recover the actual damages suffered ... as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.
 
 
 37
 17 U.S.C. § 504(b).
 
 
 38
 Actual damages are defined as "the extent to which the market value of a copyrighted work has been injured or destroyed by an infringement." ... The Ninth Circuit test for market value is "what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work."
 
 
 39
 United States v. King Features Entertainment, Inc., 843 F.2d 394, 400 (9th Cir.1988) (citations omitted).[6] The district court's calculation of damages is reviewed for clear error. See Eales v. Environmental Lifestyles, Inc., 958 F.2d 876, 879 (9th Cir.), cert. denied sub nom. Shotey v. Eales, 113 S.Ct. 605 (1992).
 
 
 40
 The district court accepted the Special Master's calculations and awarded the Producer damages of $2,228,000 (split evenly between domestic and foreign distribution). The Special Master found that the home video rights had a reasonable market value of $3,000,000 at the time they were misappropriated and a minor residual value of $150,000 after the misappropriation. The final figure was calculated by reducing the market value by the 20% to which UA was entitled by the Agreements.
 
 
 41
 The Special Master based his calculations upon the testimony of plaintiffs' expert Seth M. Willenson. The Distributors claim that the Special Master erred by disregarding the testimony of defense witness Waleed Ali, who made an actual offer on behalf of MPI, Inc. for home video rights for substantially less than Willenson's figures (i.e., a ten-year term with a guarantee of $700,000 and a 50% royalty). While it might have been preferable for the Special Master to explain why Ali's testimony was not persuasive, this failure does not constitute clear error. The damage award was supported by evidence in the record.[7]
 
 VI. Attorney's Fees
 The Copyright Act provides:
 
 42
 In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party.... Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.
 
 
 43
 17 U.S.C § 505. An award of attorney's fees is reviewed for abuse of discretion. See McCulloch v. Albert E. Price, Inc., 823 F.2d 316, 322 (9th Cir.1987). A sum of $536,925.48 was awarded to the Plaintiffs for "attorney's fees and litigation costs."
 
 
 44
 While a prevailing defendant must demonstrate frivolity or bad faith to recover attorney's fees under § 505, plaintiffs "may be awarded attorney's fees simply by virtue of prevailing in the action" so long as the amount is "reasonable." Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 886 F.2d 1545, 1556 (9th Cir.1989) ("Frank Music II "), cert. denied, 494 U.S. 1017 (1990). But not every prevailing plaintiff is entitled to attorney's fees.
 
 
 45
 Considerations which justify the denial of fees may include (1) the presence of a complex or novel issue of law that the defendant litigates vigorously and in good faith, (2) the defendant's status as innocent, rather than willful or knowing, infringer, (3) the plaintiff's prosecution of the case in bad faith, and (4) the defendant's good faith attempt to avoid infringement.
 
 
 46
 McCulloch, 823 F.2d at 323. This court will reverse and remand when the district court fails to explain the basis for the award. See id.
 
 
 47
 The issue of attorney's fees was the subject of extensive briefing and oral argument below. The Special Master calculated the total amount of fees which were incurred each month, and made a specific finding as to the "special" hourly rate of plaintiffs' lead counsel Bertram Fields ($400/hour), whose skill and efficiency he credited with expediting the trial. Thus there was sufficient explanation for the amount awarded, and the award was not an abuse of discretion.
 
 
 48
 The Distributors also object to the award of $27,848.73 in "litigation expenses."[8] Courts may only tax as costs those items defined or "encompassed" by 28 U.S.C. § 1920. See Alflex Corp. v. Underwriters Lab., Inc., 914 F.2d 175, 176 (9th Cir.1990), cert. denied, 112 S.Ct. 61 (1991) (citation omitted). However, this circuit has also allowed reimbursement for out-of-pocket litigation expenses "distinct from the costs already awarded" under other statutes. See, e.g., United Steelworkers of America v. Phelps Dodge Corp., 896 F.2d 403, 407 (9th Cir.1990).
 
 
 49
 The Special Master specifically delineated which expenses were "reasonable" and "necessary," awarded less than the amount claimed, and subtracted 25% of the total as normal overhead expenditures. On the basis of the analysis in United Steelworkers, we affirm this portion of the award. Appellees' request for attorney's fees on appeal under § 505 is denied.
 
 VII. Prejudgment Interest
 
 50
 Finally, the Producer has cross-appealed from the district court's denial of prejudgment interest. The Special Master had awarded prejudgment interest at the rate of 10% per annum. An award of prejudgment interest is reviewed for abuse of discretion. See Mutuelles Unies v. Kroll & Linstrom, 957 F.2d 707, 714 (9th Cir.1992).
 
 
 51
 The district court declined to award prejudgment interest under the current version of the Copyright Act ("1976 Act"). In Frank Music II, 886 F.2d at 1551, we held that prejudgment interest was available under the previous version of the Act ("1909 Act"). However, we left open the availability of interest under the 1976 Act. Id. at 1552 n. 9.[9]
 
 
 52
 We need not pass upon the availability of prejudgment interest under the 1976 Act, however, because the district court indicated that it was not warranted by the facts of this case. Rather than stating that prejudgment interest was unavailable as a matter of law, the court stated that such interest was not appropriate. By way of explanation, the court noted that the "actual video cassette market value of the Picture would likely be realized over time," and thus that interest on the entire amount of damages would be a "windfall" for plaintiffs. This reasoning is persuasive, and the decision not to award interest was not an abuse of discretion.
 
 
 53
 AFFIRMED.
 
 
 54
 * * *
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Paragraph 10 of the Distribution Agreement gives UA:
 the sole, exclusive, and irrevocable right ... to rent, lease, license, exhibit, distribute, reissue and otherwise deal in and with respect to the Picture and ... to license others to do so throughout the world ... for a period of ten (10) years from the first general release of the Picture
 The rights herein granted, without limiting the generality of the foregoing, shall include all so-called "theatrical" rights in the Picture ... and shall also include the right to [do] .. and [to] authorize and license others to project, exhibit, reproduce, transmit and perform the Picture and prints and trailers thereof by television and by any other technological, mechanical or electronic means, method or device now known or hereafter conceived or created.
 Pay, toll, and subscription television were defined as "theatrical" rather than "television" rights.
 
 
 [2]
 Paragraph 13 of the Financing Agreement reiterates the ten-year distribution term and continues:
 [U]pon the expiration or sooner termination of the distribution rights ... Producer and United shall have joint control over the further distribution, exploitation, exhibition, sale, or any other disposition whatsoever of the Picture ... and no disposition whatsoever shall be made of such Picture or any part thereof by either Producer or United without the written consent of the other....
 After the expiration of the distribution term, either party could offer to buy or sell its rights in the Picture to the other party. The second-to-last provision of paragraph 13 provides:
 Notwithstanding anything to the contrary contained herein or in the Distribution Agreement, it is hereby specifically understood and agreed that, until and unless Producer has exercised the aforesaid "buy-or-sell" provisions with respect to the Picture, United's sole and exclusive distribution and exploitation rights with respect to the Picture shall automatically continue and endure.
 
 
 [3]
 The Distributors also contest the admission of documents written in the 1970's by other UA employees. However, they cite no relevant authority for the proposition that such "subsequent interpretations" are inadmissible. Indeed, the "practical interpretation of the contract by one party, evidenced by his words or acts, can be used against him on behalf of the other party, even though that other party had no knowledge of those words or acts when they occurred and did not concur in them." Arthur L. Corbin, Corbin on Contracts § 558 (1960)
 
 
 [4]
 Two district courts have held that similar "future technology" clauses were broad enough to encompass home video rights. See Rooney v. Columbia Pictures Indus., Inc., 538 F.Supp. 211 (S.D.N.Y.) aff'd without opinion, 714 F.2d 117 (2d Cir.1982), cert. denied, 460 U.S. 1084 (1983); Platinum Record Co. v. Lucasfilm, Ltd., 566 F.Supp. 226, 228 (D.N.J.1983). However, these contracts did not include provisions which limited defendants to theatrical and television rights, as the Agreements do here
 
 
 [5]
 The Distributors attempt to limit Peter Starr to its holding that the federal court had subject matter jurisdiction over the claim. But in finding subject matter jurisdiction, we necessarily concluded that a valid infringement claim had been raised
 
 
 [6]
 "The test is not what some buyer was willing to pay, but what a buyer would have been willing to pay for a use of a plaintiff's work similar to the defendant's use." Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 513 (9th Cir.1985)
 
 
 [7]
 The Distributors ask that $28,000 of home video revenues which Subafilms has already accepted be deducted from the damages award; Appellees do not object
 
 
 [8]
 The Distributors also object to the award of $41,826.47 in taxable costs. Because the Distributors have not provided us with a complete description of the disputed costs, we cannot assess whether they were proper under 28 U.S.C. § 1920
 
 
 [9]
 Other circuits are split on this issue. Compare Kleier Advertising, Inc. v. Premier Pontiac, Inc., 921 F.2d 1036, 1040-41 (10th Cir.1990) (holding that prejudgment interest may indeed be awarded under the 1976 Act), with Robert R. Jones Assoc., Inc. v. Nino Homes, 858 F.2d 274, 282 (6th Cir.1988) (vacating an award of prejudgment interest)