**ABKCO MUSIC, INC., Plaintiff,**

v.

**HARRISONGS MUSIC, LTD., Harrisongs Music, Inc., George Harrison, Apple Records, Ltd., Apple Records, Inc., Broadcast Music, Inc., and Hansen Publications, Inc., Defendants,**

v.

**ABKCO INDUSTRIES, INC. and Allen Klein, Additional Parties with Respect to the Counter-Claims.**

No. 71 Civ. 602.

United States District Court,
S. D. New York.

Feb. 19, 1981.

Pryor, Cashman, Sherman & Flynn, New York City, for ABKCO Music, Inc. and ABKCO Industries, Inc. and Allen Klein; Gideon Cashman, James A. Janowitz, Donald S. Zakarin, New York City, of counsel.

Santora, Shenkman & Kushel, New York City, for all defendants except Hansen Publications, Inc.; Joseph J. Santora, New York City, of counsel.

Barovick, Konecky, Braun, Schwartz & Kay, New York City, for Hansen Publications, Inc.; Richard Z. Lehv, David S. Rosenthal, New York City, of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York City, for Apple Records Limited and Apple Records, Inc.; Albert S. Pergam, New York City, of counsel.

## OPINION

OWEN, District Judge.

In this action by Bright Tunes Music Corporation for infringement of its copyright in the 1963 hit song "He's So Fine", I earlier concluded that defendant George Harrison had subconsciously plagiarized "He's So Fine" in arriving at the melody of his hit song, "My Sweet Lord", in 1971. *Bright Tunes Music Corp. v. Harrisongs Music, Ltd.*, 420 F.Supp. 177 (S.D.N.Y.1976). I thereafter scheduled hearings to determine the damages flowing from that infringement and the parties responsible therefor, and extensive discovery commenced. Prior to the date for hearings, however, Bright Tunes sold, for $587,000.00, its copyright in "He's So Fine" and its rights in this litigation to ABKCO Music, Inc., of which Allen B. Klein, the "ABK" of ABKCO, is the moving spirit, owner, and principal officer. This immediately caused strong reaction from the Harrison interests [1] because ABKCO had been the exclusive business manager for George Harrison and his musical interests from November, 1970 to March 13, 1973,[2] the period in which the claim of infringement was first asserted.

Upon ABKCO being substituted as plaintiff herein, the Harrison interests amended their pleadings to assert, in one form or another, a breach of fiduciary duty by ABKCO, which, according to Harrison, disqualifies ABKCO from recovering in this action.

Testimony has now been taken on both the issue of damages and the question of ABKCO's disqualification. While I am of the view that ABKCO's conduct from 1975 to 1978 limits its recovery herein, *see infra*, it is nonetheless appropriate to determine first what the recovery would have been had ABKCO not become the plaintiff in the way it did, and to set forth the court's findings accordingly, albeit in somewhat summary fashion.

The earnings of the song "My Sweet Lord" have come from four principal

---

1. The "Harrison interests" include Harrisongs Music Ltd., Harrisongs Music, Inc., George Harrison, Apple Records, Ltd., and Apple Records, Inc.

2. ABKCO was discharged in March of 1973, triggering bitter litigation which was eventually settled for $4.2 million.

sources: mechanical royalties,[3] performance royalties,[4] the sale of sheet music and folios, and the profits of Apple Records, Inc., the Harrison-owned manufacturer of the principal recordings of "My Sweet Lord".

■ Mechanical royalties attributable solely to "My Sweet Lord" total $260,103. Plaintiff contends that it is also entitled to some portion of the mechanical royalties Harrison received for the relatively unsuccessful songs on the same discs with "My Sweet Lord" which, it argues, would not have been earned but for the unusual popularity of "My Sweet Lord". In assessing plaintiff's argument, two things must be kept in mind. First, on the single record, the song "My Sweet Lord", a hit, was teamed with "Isn't It a Pity", a non-hit; on the twelve-inch album, "All Things Must Pass", "My Sweet Lord" was one of twenty-two Harrison songs, only one other of which achieved even modest popularity. Second, exactly the same mechanical royalty is payable to Harrison for each of his songs on any given record, whether memorable or not. Common sense dictates that a hit song contributes more to the sale of a record than does a less popular song. In such circumstance, mechanical royalties paid to a composer for a less-than-memorable song on the record are, in fact, earned by the memorable song which has caused the public to purchase the record. While not susceptible to quite the precision one might prefer, a reasonable determination of the total earnings allocable to "My Sweet Lord" can be made here and is an appropriate item of damage for the court to award.[5] *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F.Supp. 531 (S.D.N.Y.1977), aff'd 592 F.2d 651 (2d Cir. 1978).

■ I turn first to the earnings of the single. By a ratio of sixteen to one disc jockeys played "My Sweet Lord" more frequently than the song on the single's flip side, "Isn't It a Pity". With respect to the album "All Things Must Pass", containing twenty-two songs, disc jockeys played "My Sweet Lord" seventy percent of the time that they aired any song from the album. I therefore find that, conservatively, seventy percent of the total mechanical royalties earned by the single were attributable to "My Sweet Lord".[6] In addition, I find,

3. A mechanical royalty is an amount per record payable by a manufacturer of a recording to the music publisher who licenses the use of the song on the record. When a record is made with a second song on the reverse side (a "single"), a separate mechanical royalty is payable for that second song as well.

4. Performance royalties are monies payable to the publisher and writer generated by the public performance of the composition and generally associated with radio broadcasts. In this case, Broadcast Music, Inc. (BMI), a performing rights society, was charged with the responsibility of collecting money from users of "My Sweet Lord" and paying said royalties.

5. This can be done on the basis of the BMI monitoring of air play by disc jockeys of each of the Harrison songs that were included on the album "All Things Must Pass". The results of this monitoring are entitled to substantial weight, for they are the basis on which BMI pays performing royalties on its catalogue.

That monitoring, over the five-year period from December, 1970 to December, 1975 for the twenty-two Harrison songs on the album "All Things Must Pass", shows the following relative percentages of air play:

| COMPOSITION | PERCENTAGE |
|---|---|
| I'D HAVE YOU ANYTIME | |
| MY SWEET LORD | 70% |
| WAH–WAH | 1% |
| ISN'T IT A PITY | 4% |
| WHAT IS LIFE | 20% |
| IF NOT FOR YOUR | |
| BEHIND THAT LOCKED DOOR | |
| LET IT DOWN | |
| RUN OF THE MILL | |
| BEWARE OF DARKNESS | 1% |
| APPLE SCRUFFS | 1% |
| BALLAD OF SIR FRANKIE | |
| AWAITING ON YOU | 1% |
| ALL THINGS MUST PASS | 1% |
| I DIG LOVE | 1% |
| ART OF DYING | |
| HEAR ME LORD | |
| OUT OF THE BLUE | |
| IT'S JOHNNY'S BIRTHDAY | |
| PLUG ME IN | |
| I REMEMBER JEEP | |
| THANKS FOR THE PEPPERONI | ——— |
| | 100% |

6. While the BMI monitoring provides good evidence of the disc jockeys' collective opinion as to popularity, and this may well accurately mirror the public's opinion, other factors may

again calculating conservatively, that fifty percent of the mechanical royalties earned by the album "All Things Must Pass" are attributable to "My Sweet Lord".

The album entitled "The Best of George Harrison" is another matter. The trial record provides me with no guidance as to the relative popularity of a number of the album's songs. Since this album was issued several years after the initial release of "My Sweet Lord", has a number of different songs, and is entitled "The Best", I conclude that these are all songs with substantial popularity. With respect to "The Best of George Harrison", therefore, I find that plaintiff has failed to establish that "My Sweet Lord" earned more than its own mechanical royalties.

The foregoing findings yield the following calculation of gross earnings by "My Sweet Lord" from mechanical royalties: from the single, $54,526.00; from the album "All Things Must Pass", $588,188.00; from "The Best of George Harrison", $6,887.00; for a total of $646,601.00.[7]

Performance royalties, which came solely from BMI figures, total $359,794.00, and sheet music earnings total $67,675.00.

Apple Records, Inc., the Harrison-owned manufacturer of his records, has a "spread"[8] on the manufacturing of records, which constitutes earnings to Harrison. Applying the ratios comparing the air play given "My Sweet Lord" to the air play of the various other Harrison songs, i. e., the ratios used above to calculate mechanical royalties, see supra, I find that Apple's earnings from the "spread" that are attrib-

utable to "My Sweet Lord" are: from the single, $130,629.00; from "All Things Must Pass", $925,731.00; and from "The Best of George Harrison", $21,598.00;[9] for a total of $1,077,958.00.

The total gross earnings of "My Sweet Lord" as calculated above are $2,152,028.00. From this total the Harrison interests contend there must be deducted a number of expense items, which I now treat seriatim. The Euro-Atlantic management fee, legal and professional fees, certain salaries, certain telephone expenses, United States public relations and promotions, and certain income taxes, are all disallowed. Basically, Harrison has not proven, even with minimum specificity, that those expenses are attributable to "My Sweet Lord". A certain twenty percent ABKCO commission already paid to ABKCO and the three and one-quarter percent commission paid to the Harry Fox Agency, totalling $18,712.00, are both allowed, thereby reducing the total earnings figure set forth above to $2,133,316.00.

■ Next, I must determine the portion of the above income which should be attributed to factors, other than the plagiarized music, affecting public interest in the song "My Sweet Lord".[10] Several matters must be considered. Harrison, an artist with an international "name," supplied his own text. How much of the income is attributable to the text, to the selling power of his name? Although this is not an area susceptible to precise measurement, I conclude that three-fourths of "My Sweet Lord's" success is due to plagiarized tune and one-

conceivably have influenced sales. Such factors may include, for example, the display of a new Harrison release at the record store. These other possible factors cause me to regard the BMI figures as "some evidence" of popularity, but not absolutely binding upon me.

7. Canadian royalties are included. The lacquer masters, art work, packaging and licenses were all prepared in the United States. *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45 (2d Cir. 1939), aff'd 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940); *Famous Music Corp. v. Seeco Records, Inc.*, 201 F.Supp. 560 (S.D.N.Y.1961).

8. A spread is the difference between the price Capitol Records Inc. charged Apple to press a record and the price at which Apple sold the finished record to Capitol Records Distributing Corp.

9. I decline to award statutory "in lieu" damages as to "The Best of George Harrison."

10. Had I earlier found that Harrison deliberately plagiarized the music, I would award the entire earnings of "My Sweet Lord." *See, Shapiro, Bernstein & Co., Inc. v. Jerry Vogel Music Co., Inc.*, 115 F.Supp. 754 (S.D.N.Y.1953), *rev'd on other grounds*, 223 F.2d 252 (2d Cir. 1955).

fourth to other factors, such as the words and the popularity and stature of George Harrison in this particular field of music.[11] I weigh the music heavily in this case because the music had already demonstrated its outstanding "catchiness" in 1963 when it carried the rather unexceptional, romantic text of "He's So Fine" to first place on the Billboard charts in the United States for five weeks.

Given all the foregoing, I conclude that $1,599,987.00 of "My Sweet Lord's" earnings are reasonably attributable to the music of "He's So Fine".

Now, however, I must turn to the troublesome question of whether ABKCO may be awarded the amount calculated above or whether its conduct vis-a-vis Harrison, its former employer, regarding this very litigation in any manner limits or destroys its right of recovery.

As has been stated earlier, in the years 1971–73, Allen B. Klein, through ABKCO, the present plaintiff, was the overall business manager of George Harrison and his musical interests. ABKCO took care of all the financial matters, including negotiating contracts and keeping the financial books and records. For these services ABKCO was paid twenty percent of the gross income from the Harrison ventures. As Harrison's business manager, Klein obviously was aware of both the artistic and financial success of "My Sweet Lord". It was during ABKCO's tenure as business manager that this suit was commenced by Bright Tunes. It was ABKCO that obtained an opinion from musicologist Harold Barlow as to the suit's lack of merit.[12] ABKCO thereafter engaged experienced counsel in New York City to defend; all of these actions were taken before ABKCO's own services were terminated by Harrison in March 1973. I do not find that any of the steps taken by ABKCO, while acting as Harrison's business manager, to defend this action were in any way inappropriate or other than in good faith.

More troublesome, however, is Klein's covert intrusion into the settlement negotiation picture in late 1975 and early 1976, immediately preceding the trial on the merits. At this crucial time Harrison made a settlement proposal which, at the time, Bright Tunes' lawyer regarded as "a good one." Unknown to Harrison, Klein, at that point still involved in bitter post-firing litigation with Harrison, made a substantially higher offer to purchase Bright Tunes' claim on behalf of ABKCO, thereby causing Bright Tunes to conclude that the level at which it had been negotiating with Harrison was far too low.[13] Bright Tunes reached this conclusion, in part, on the not-unjustified assumption expressed by one of its principals, that Klein, known to Bright Tunes as Harrison's former business manager, "may be in a better position to judge whether the [infringement litigation] will be successful than we are.[14]

Thereafter, Harrison's unwillingness to discuss a larger settlement and Klein's failure to better ABKCO's offer—Bright Tunes viewed that offer merely as an "opener"—necessarily forced the case to trial on the merits. Harrison, after the trial, made no further serious efforts to deal with Bright Tunes' higher demands and the claim was finally bought by ABKCO in 1978 for a sum more than double Klein's own first offer.

11. In this case I conclude that the much-touted "hook,"—an introductory musical motive used by Harrison—was a minimal factor.

12. Mr. Barlow later testified at the trial. Although the court found his testimony in this case unpersuasive, this in no way detracts from the appropriateness of ABKCO's utilizing his services, for Mr. Barlow is a highly knowledgeable musicologist.

13. Harrison's offer was $148,000 to settle only the question of damages arising from alleged copyright infringement in the United States.

Klein's offer was $100,000 for a call on 100% of the Bright Tunes' stock—thus a world-wide settlement—exercisable for an additional $160,000, in the event of a finding in favor of Bright Tunes at the liability trial. I note that Klein, in fact, bought Bright Tunes' rights in "He's So Fine" in 1978, after the finding of infringement, for $587,000. *See, infra.*

14. Letter of Tenenbaum, Receiver of Bright Tunes, to Barash, a major stockholder of Bright Tunes, December 3, 1975.

I conclude that ABKCO's intrusion into and interference with Harrison's 1975 and January 1976 settlement efforts were to the probable detriment[15] of its former client. This is particularly so since Klein's proposals were regarded by Bright Tunes as being highly credible, i. e., based on Klein's intimate knowledge gleaned from his former relationship to Harrison. This impropriety was further compounded by the fact that in December, 1975, in the course of his discussions and in an effort to support his proposal, Klein covertly furnished Bright Tunes with certain of Harrison's financial schedules which he had acquired while Harrison's business manager. ABKCO now seeks to avoid the impact of this conduct by arguing that Bright Tunes, in any event, would have been entitled to this information in the course of discovery. At the time this information was furnished by Klein, however, Bright Tunes had not yet prevailed on the liability issue and was therefore not entitled to this information. Consequently, its submission by Klein to Bright Tunes at that time was impermissible. These actions, in my judgment, constituted a breach of ABKCO's duty to Harrison which is not to be rewarded by this court. See *Byrne v. Barrett*, 268 N.Y. 199, 197 N.E. 217 (1935) and *Group Association Plans, Inc. v. Colquhoun*, 466 F.2d 469 (D.C. Cir.1972).

While one cannot be certain on this record that Harrison would have been able to settle the plagiarism action prior to trial "but for" ABKCO's conduct, and while the contemporaneous letters of Seymour Barash, the major stockholder of Bright Tunes, reveal an attitude toward the case which might, in the final analysis, have gotten in the way of a settlement, it is nonetheless clear that good faith negotiations were going on and that the pending offer by Harrison was regarded by the attorney for Bright Tunes as a reasonable one. It is also evident that ABKCO's higher offer to purchase the claim for its own account, supported as it was by ABKCO's intimate knowledge of Harrison's financial affairs and records of the earnings of Harrisong and Apple Records, was viewed by Bright Tunes as an insider's disclosure of the value of the case. Klein's conduct, in any event, changed Bright Tunes' attitude toward the Harrison proposal. This intrusion irreparably destroyed the ability of Harrison to further negotiate a settlement in a range that Bright Tunes' lawyer had already determined to be "good."

I therefore conclude that ABKCO is not entitled to profit from its eventual purchase of all of Bright Tunes' rights in "He's So Fine"—essentially Bright Tunes' only asset. *In Re McCrory Stores Corp.*, 12 F.Supp. 267, 269 (S.D.N.Y.1935). On the other hand, I also conclude that ABKCO is not required to forfeit the cost of its acquisition. Had it been shown that Bright Tunes and Harrison were realistically close to a specific figure in their settlement negotiations, I could have utilized such a figure for the resolution of the issue here; absent such proof, I deem the figure at which ABKCO did purchase Bright Tunes' rights in "He's So Fine" to be the appropriate one. I therefore direct that plaintiff ABKCO is to hold the fruits of its acquisition of April 13, 1978 in trust for the Harrison interests to be transferred to Harrison or an appropriate designee upon the payment of $587,000.00[16] together with interest from the date of acquisition for which amount plaintiff shall have judgment. Further relief by plaintiff against the Harrison interests is denied. The claims against Broadcast Music, Inc., and Hansen Publications, Inc. are dismissed. The counterclaims asserted against ABKCO Industries, Inc., and Allen Klein are dismissed. The foregoing constitutes the court's findings of fact and conclusions of law.

---

**15.** I do not believe that under the circumstances Harrison must show that a settlement was in hand, but merely, as has been proven, that good faith negotiations were in progress and that given the position of each of the parties, one would conclude that an eventual settlement was a reasonable possibility.

**16.** ABKCO paid $422,500.00 to Bright Tunes and an additional $165,000.00 to the composer's heir; the latter sum was paid partly in cash and partly to purchase a nine-year $15,000.00 annuity for heir's benefit.

Settle order and judgment effectuating the foregoing.