### In re INDEPENDENT SERVICE ORGANIZATIONS ANTITRUST LITIGATION.

This Document Applies To CSU, L.L.C. v. Xerox Corp. (D. Kan. No. 94–2102–EEO).

**Civil Action No. MDL–1021.**

United States District Court, D. Kansas.

Sept. 3, 1998.

**1244**

P. John Owen, Morrison & Hecker L.L.P., Kansas City, MO, for CSU, L.L.C., plaintiff.

Eric D. Braverman, Employers Reinsurance Corporation, Overland Park, KS, Lori R. Schultz, Morrison & Hecker L.L.P., Kansas City, MO, for CSU, L.L.C., counterclaimant.

Peter K. Bleakley, Arnold & Porter, Washington, DC, Peter W. Marshall, Xerox Corporation, Stamford, CT, Michael G. Norris, Norris, Keplinger & Logan, L.L.C., Overland Park, KS, C. Larry O'Rourke, E. Robert Yoches, Vincent P. Kovalick, Leslie I. Bookoff, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC, for Xerox Corporation, defendant counter-claimant.

## MEMORANDUM AND ORDER

O'CONNOR, District Judge.

This is an antitrust, patent infringement, copyright infringement, and trademark infringement action. Nearly all of the parties' claims were resolved by previous summary judgment rulings by the court or settlement by the parties. The one pending claim is the copyright infringement counterclaim of defendant/counterclaim plaintiff Xerox Corporation ("Xerox"). Xerox contends that plaintiff/counterclaim defendant CSU, L.L.C. ("CSU") infringed Xerox's registered copyrights in the diagnostic software for photocopiers in Xerox's "5090" family, including the Model 5090 and Model 5390. The court already has granted summary judgment in favor of Xerox on the issues of CSU's liability and CSU's defenses. The remaining issue for trial concerned the amount of damages on Xerox's counterclaim. The parties waived their right to a jury trial on Xerox's counterclaim, and a trial was held to the court on June 16 and 17, 1998. After carefully considering the arguments of counsel, the testimony at trial, the exhibits, the deposition excerpts, and the briefing submitted by the parties, the court makes the following findings of fact and conclusions of law as required by rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. Factual Background.

1. Xerox is a New York corporation with its principal offices in Stamford, Connecticut. Xerox is engaged in the business of inventing, manufacturing, selling, and servicing document processing equipment, including photocopiers and laser printers.

2. CSU is a Kansas corporation. It is the successor in interest to the initial plaintiffs and counterclaim defendants: CSU Holdings, Inc., Copier Services Unlimited, Inc., and Copier Services Unlimited of St. Louis, Inc. CSU is engaged in the business of selling and servicing photocopiers and laser printers.

3. On December 11, 1995, the court issued a preliminary injunction, which barred

CSU, *inter alia,* from reproducing or obtaining disks containing Xerox's copyrighted diagnostic software for the 5090 family of copiers absent a license from Xerox. The preliminary injunction did not, however, bar CSU from utilizing the diagnostic software resident at the time on the hard disk drive of 5090 family copiers without a license from Xerox.

4. On March 21, 1997, this court granted in part Xerox's motion for summary judgment on its copyright infringement claims, holding that Xerox owned valid copyrights in the diagnostic software for the Model 5090 copier and that CSU had infringed Xerox's copyrights by reproducing disks containing Xerox's copyrighted diagnostic software. The court found that there were two genuine issues of material fact that precluded summary judgment: (1) whether CSU's use (and hence reproduction into random access memory ("RAM")) of diagnostic software resident on the 5090 was authorized by Xerox and hence not copyright infringement; and (2) whether CSU's defense of copyright misuse was applicable. On December 22, 1997, in light of its rulings regarding CSU's patent misuse defense, the court reconsidered its prior ruling and rejected CSU's copyright misuse defense as a matter of law. CSU has since conceded that its copying of software resident on the 5090 was not authorized by Xerox and hence constituted infringement. Accordingly, the amount of damages on Xerox's copyright infringement counterclaim is the only remaining disputed issue.

5. On July 9, 1997, the court entered a stipulated order, agreed to by both Xerox and CSU, resolving a motion for preliminary injunction by Xerox to extend the court's December 11, 1995 preliminary injunction to prohibit CSU from using the diagnostic software resident on the hard disk of 5090 copiers. Pursuant to the stipulated order, CSU agreed to obtain diagnostic software licenses for 5090 family copiers it began servicing after July 15, 1997. For copiers already serviced by CSU as of July 15, 1997, CSU agreed to obtain a diagnostic software license on the anniversary date of the service contract and to pay at that time a pro rated license fee for the number of months between July 15, 1997, and the anniversary date of the service contract.

6. Xerox's Model 5090 copiers contain two types of software. Operator software is used by the copier operator to select the parameters of the copying job, such as the number of copies to be made, whether they will be duplex (two-sided) or simplex, whether they should be stapled, etc. Diagnostic software, in contrast, is hidden from the operator by use of a secret password. The diagnostic software is used by a copier technician to diagnose problems with the copier—such as why the copier jams—and to repair the copier.

7. Although earlier copiers utilized computerized diagnostic software to aid technicians in diagnosing and repairing problems with the machine, the Xerox Model 5090 copier, introduced in 1988, offered far more sophisticated diagnostic software than previous models. For example, the 5090 diagnostic software utilizes a color touch screen to display the copier fault codes and is capable of diagnosing "almost jams" to project future failures and avoid future service calls. In order to facilitate upgrades to the software, the Model 5090 diagnostic software was the first copier software to be stored on a hard disk (also known as a "rigid disk") rather than on memory boards. Xerox has introduced four upgrades to the software offering improved diagnostic functionality since the copier was introduced in 1988.

8. Xerox's Model 5090 diagnostic software is initially loaded onto the copier's rigid disk from a series of floppy disks called "software upgrade disks;" there is a different set of floppy disks for each version of the Model 5090 software. These floppy disks can be copied using the floppy disk drive on a standard personal computer. Xerox has also created what it calls a "Diagnostic Utility Disk" for the Model 5090. This disk is used by the technician for what Mr. Gorzka, a Xerox senior technical program manager, characterized as "dangerous" routines, such as reformatting the hard disk. The Diagnostic Utility Disk is also necessary to change the password required to enter the diagnostic software.

9. Xerox's 5090 family diagnostic software is protected by valid, registered, United States Copyrights. The media on which Xe-

rox's 5090 software is distributed—Xerox's 5090 software upgrade disks and 5090 diagnostic utility disks—contain copyright notices. For versions of the Model 5090 diagnostic software after the first, Xerox placed a serial number on each Diagnostic Utility Disk. Xerox's technicians were required to sign out these disks by recording their name and the serial number of the disk. Xerox used this procedure in order to maintain control of the Diagnostic Utility Disks.

10. CSU began servicing the 5090 copier in 1992. Xerox began licensing its diagnostic software in April of 1994, and CSU could have used 5090 family diagnostic software pursuant to a software license after that date. But CSU nevertheless continued to use the resident diagnostic software and diagnostic utility disks and both used and copied the software upgrade disks without obtaining a license from Xerox after April 1994.

**B. Xerox's Damages.**

11. Xerox offered its calculation of the damages it suffered through the expert testimony of Kenneth Barker, a certified public accountant and partner with the accounting firm of Arthur Andersen. Mr. Barker has extensive experience in the calculation of damages and more than twenty years experience in the area of cost accounting.

12. CSU did not offer expert testimony on the issue of Xerox's damages. CSU's chairman, Paul Lyon, CSU's president, Richard Watkins, and CSU's controller, Doug Fecher, testified at trial for CSU. None of these individuals have experience in the calculation of damages. Mr. Fecher does not have any experience in the field of cost accounting.

13. Xerox is claiming damages only for the period after it began licensing diagnostic software in April 1994. Had CSU purchased diagnostic software licenses for each unlicensed 5090 family copier it serviced after April 1994, Xerox would have earned licensing profits totaling $91,920 in CSU's fiscal year ("FY") 1995 (which ended March 31, 1995), $195,330 in FY 1996, $328,450 in FY 1997, and $85,970 in FY 1998. *See* Exh. 405.

These lost licensing profits total $701,670. CSU does not dispute these calculations.

14. Pursuant to an agreement of the parties, entered by the court as a stipulated order on July 9, 1997, CSU agreed to pay a *pro rata* license fee for the 5090 copiers it serviced at the time of the order when the service contract on those copiers renewed. The *pro rata* fee would be calculated based on the time that elapsed between July 15, 1997, and the renewal date. These *pro rata* license fees, which CSU agreed to pay, total $153,873. Mr. Barker properly credited these *pro rata* fees against Xerox's lost licensing profits to avoid double counting, yielding total lost licensing profits to Xerox of $547,797. *See* Trial Tr. at 62–63; Exh. 405.

15. Xerox's cost of borrowing is the prime rate. Had Xerox received the licensing profits at the time the licensing fees should have been paid by CSU, Xerox would have been able to reduce its borrowings by a corresponding amount. Accordingly, if prejudgment interest is to be awarded, the appropriate rate to use for prejudgment interest on these lost licensing profits in order to make Xerox whole is the prime rate. If prejudgment interest is awarded at the prime rate, the present value (as of September 3, 1998) of Xerox's lost licensing profits would total $692,137, including the credit of *pro rata* fees to avoid double counting.[1]

16. The next element of damages is CSU's profit on the service and sale of 5090 copiers attributable to its infringement of Xerox's diagnostic software. CSU's revenue from the service and sale of unlicensed 5090 family copiers from April 1, 1994, through July 15, 1997, totals $6,747,660. *See* Exh. 405. CSU's unlicensed 5090 revenue increased from $1,158,807 in FY 1995, to $1,911,962 in FY 1996, to $2,890,530 in FY 1997. CSU's unlicensed 5090 revenue for FY 1998, from April 1, 1997, to July 15, 1997, was $997,892. The court has used the CSU revenue numbers provided by Xerox. The revenue figures provided by CSU are overstated

1. At trial, Xerox presented evidence that the present value of Xerox's lost profits would total $677,152 as of June 1, 1998. *See* Trial Tr. at 62–63; Exh. 405. The court has added $14,985 to reflect the present value of Xerox's lost licensing profits as of the date of this order—September 3, 1998.

because CSU has included all 5090 revenue, instead of the smaller number which should have been used—CSU's revenue from only unlicensed copiers. CSU did purchase a few licenses for diagnostic software, and revenue attributable to that software should not be included with the unlicensed 5090 revenue.

17. CSU's unlicensed 5090 service revenue from April 1, 1997, to July 15, 1997 totals $881,809 and was calculated as follows. The court multiplied the amount of revenue per service contract for this time period ($9,572) times the number of copiers for which CSU actually purchased, or has agreed to purchase, a license (90). The court has added the revenue from the service contract for which CSU purchased a license prior to July 15, 1997 ($1,732 for serial # W81–075788) and the revenue from the service contract which did not renew in FY 1998 and for which no license has been purchased ($18,597 for serial # 2FK–010545).

18. CSU's unlicensed 5090 sales revenue from April 1, 1997, to July 15, 1997, totals $116,083 and was calculated as follows. The court multiplied FY 1998 unlicensed 5090 sales revenue ($398,000) by 3.5 and divided by 12.

19. CSU's total revenue increased from $10,203,142 in FY 1995, to $12,722,709 in FY 1996, and to $16,547,938 in FY 1997. See Exh. 1. CSU's total revenue for FY 1998, from April 1, 1997, to July 15, 1997, was $5,648,376. See id.

20. CSU's unlicensed 5090 revenue comprised 11.36% of CSU's total revenue in FY 1995, 15.03% of CSU's total revenue in FY 1996, 17.47% of CSU's total revenue in FY 1997, and 17.67% of CSU's total revenue in FY 1998 (ending 7/15/97).

21. CSU's cost of sales for the service of unlicensed 5090 family copiers includes the direct cost of the parts and labor utilized in servicing the copier plus the commissions (6.0%) paid when CSU sales representatives sold service contracts. Likewise, CSU's cost of sales for the sale of refurbished 5090 copiers includes the direct cost of parts and labor utilized in refurbishing the copier plus the commissions (6.5%) paid when CSU sales representatives sold refurbished copiers.

22. CSU's cost of sales for the service and sale of unlicensed 5090 family copiers from April 1, 1994, through July 15, 1997, totals $5,479,997. The court calculated cost of sales by using the numbers set forth in exhibit 405 for fiscal years 1995, 1996, and 1997 and adding commissions on service revenues at a rate of 6%. See Trial Tr. at 117. For fiscal year 1998, the court determined cost of sales by multiplying the cost of sales numbers set forth in exhibit 405 by 3.5 (the number of months in FY 1998 relevant to the damage calculation) and dividing by 12. Then, the court added a 6% commission on service revenues.

23. It is also necessary to deduct the cost of the license fees CSU should have paid as part of CSU's cost of sales for service contracts in order to avoid double-counting damages. CSU would have paid $749,170 for licenses. This figure is greater than Xerox's lost licensing profits because Xerox's profits are the revenue it would have received net of Xerox's costs, while CSU's deductible expense is the total amount it would have paid.

24. CSU's travel and entertainment, auto, postage and freight, and moving expenses total $252,004 for FY 1995, $388,089 for FY 1996, and $458,667 for FY 1997. See Exh. 2. No evidence was presented as to the amount of these expenses in FY 1998.

25. CSU's travel and entertainment, auto, postage and freight, and moving expenses vary directly in relation to 5090 revenue in the short term. See Exh. 2; Trial Tr. at 121–23, 174–76, 178. CSU has offered a reasonable methodology for allocating these expenses to 5090 revenue by using a percentage of revenue approach.

26. CSU is entitled to deduct from its 5090 revenue a portion of its travel and entertainment, auto, postage and freight, and moving expenses based on the percentage that 5090 revenue bears to total revenue. Accordingly, CSU's deductible expenses for these items are $28,628 for FY 1995, $58,330 for FY 1996, and $80,129 for FY 1997.

27. CSU's other sales, general, and administrative ("SG & A") expenses listed on exhibit 2 are not deductible. These nondeductible expenses include salaries and bonuses, employee benefits, insurance, taxes and licenses, accounting and legal, rent, management fee, contract labor, profit sharing,

repairs and maintenance, utilities, telephone and communications, supplies, tools, contributions, bad debts, and miscellaneous expenses. CSU failed to show a nexus between each of these expenses and 5090 revenue and failed to offer a fair and reasonable methodology for allocating a portion of each of these expenses to 5090 revenue. *See, e.g.*, Trial Tr. at 201 (Q: What if you have a 5 percent increase in service revenue, would you have any increase in SG & A? "A (by Mr. Fecher): I would hope—would think not. It depends on what critical mass I am when I get that 5 percent increase."); Trial Tr. at 218–19 (Mr. Lyon testified that some SG & A expenses are overstated and some are understated by allocation but "it would all come out in the wash.").

28. CSU presented insufficient evidence to support the deductibility of its salary and rent expenses. CSU's revenue from the sale of refurbished 5090 copiers fell from almost $1.3 million in fiscal year 1997 to approximately $400,000 in fiscal year 1998. Yet CSU did not fire anyone, did not reduce anyone's salary, and did not reduce its rent expense by renegotiating leases. For example, CSU did not cut the salary of Bill Hamilton, the employee responsible for sourcing used 5090 copiers for refurbishment and resale even when he needed to source 60% fewer copiers as sales dropped and did not fire any of its 14 sales representatives even though they sold 60% fewer 5090 copiers. CSU could not fire Mr. Hamilton or any of these sales representatives because they were still needed for tasks unrelated to the 5090. *See* Trial Tr. at 182–88. Because these expenses did not vary with 5090 revenue, they cannot be deemed short-term variable costs.

29. CSU's bad debt expense for FY 1998 was $47,000, all of which was attributable to 5090 revenue. *See id.* at 121. Only 3.5 months of FY 1998, however, are included in the court's damage calculation. Accordingly, the court will deduct $13,708 ($47,000 times 3.5 divided by 12) as an expense attributable to unlicensed 5090 revenue. CSU was unsure if any of its bad debts from prior years were related to the 5090, so the court will not deduct any portion of CSU's bad debts expense for prior years. *See id.*

30. When an infringer has multiple endeavors and does not finance separately each line or product, it is acceptable to determine deductible interest by using the proportionate costs of the infringing line or product in relation to the defendant's full cost of production. Thus, the proportion of cost translates into a percentage of all borrowing costs, and the resulting share of interest expense is deducted. CSU's interest expense directly related to the production of unlicensed 5090 revenues was $49,051 for FY 1995, $61,089 for FY 1996, $100,240 for FY 1997, and $40,-431 for FY 1998 (ending 7/15/97). Xerox does not dispute the deductibility of interest expense. The court has calculated CSU's interest expense based on the percentage of revenue figures set forth above, *see supra* text ¶ 20, but otherwise has adopted the methodology set forth in plaintiff's exhibit 4.

31. The proper interest rate to use to adjust CSU's profits from service and sale of 5090 copiers for prejudgment interest is the rate at which CSU borrows money, because CSU's service and sale profits on unlicensed 5090s were in essence an interest-free loan that CSU received and must now repay. CSU's borrowing rate is 2% over the prime rate, and prejudgment interest must accordingly be calculated at this rate if CSU is to be put in the same position it would have been but for the infringement. Applying an interest rate of 2% over the prime rate to CSU's profits of $298,418 yields a present value of $347,145.

32. The following is a summary of the court's findings relating to CSU's profit attributable to its infringement of Xerox's copyrights for 5090 diagnostic software.

| | FY 1995 | FY 1996 | FY 1997 | FY 1998 | TOTAL |
|---|---|---|---|---|---|
| Unlicensed 5090 Revenue | $1,158,807 | $1,911,962 | $2,890,530 | $997,892 | $6,959,191 |

| | | | | | |
|---|---|---|---|---|---|
| Cost Of Sales + Commissions | 1,033,252 | 1,440,549 | 2,346,124 | 660,072 | 5,479,997 |
| License Fees | 97,920 | 208,080 | 349,950 | 93,220 | 749,170 |
| Deductible SG&A Expense | 28,628 | 58,330 | 80,129 | 13,708 | 180,795 |
| Interest Expense | 49,051 | 61,089 | 100,240 | 40,431 | 250,811 |
| CSU's Profit | (50,044) | 143,914 | 14,087 | 190,461 | 298,418 |
| Present Value Of CSU's Profit | (75,550) | 195,609 | 17,239 | 209,847 | 347,145 |

33. The total of the present value of Xerox's lost licensing profits ($692,137) and the present value of CSU's profits attributable to the service and sale of unlicensed 5090 family copiers ($347,145) is $1,039,282.

## II. CONCLUSIONS OF LAW

### A. Xerox's Damages.

"The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." Copyright Act § 504(b); 17 U.S.C. § 504(b). A copyright owner's actual damages are equal to the profits it would have earned but for the defendant's infringement. *See, e.g., Banff, Ltd. v. Express, Inc.*, 921 F.Supp. 1065, 1068 (S.D.N.Y.1995); *Jarvis v. A & M Records*, 827 F.Supp. 282, 293 (D.N.J. 1993); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.02[A], at 14–10 (1997) (henceforth "Nimmer"). Both parties agree that Xerox is entitled to recover both its lost profits from the licensing of 5090 family diagnostic software and CSU's profits attributable to its infringement of Xerox's diagnostic software copyrights.

### 1. Relevant Time Period.

On July 9, 1997, the court entered a stipulated order for the payment of license fees by CSU to Xerox from and after July 15, 1997. Pursuant to the stipulated order, CSU was required to purchase a license from Xerox on the anniversary date of each service contract for the upcoming year, plus CSU was required to pay Xerox for the *pro rata* share of a license fee from July 15, 1997, to the anniversary date of the service contract. The stipulated order basically provides for CSU's payment of license fees to Xerox for CSU's use of Xerox's copyrighted 5090 diagnostic software after July 15, 1997. Xerox concedes that CSU has complied with the stipulated order. Nevertheless, Xerox seeks damages for copyright infringement through May 1998 because CSU did not actually pay all of the license fees on July 15, 1997. *See* Xerox's Proposed Findings at 30 (the stipulated order "cannot be read as granting a license to CSU or authorizing CSU's use of the diagnostic software before a license is executed on the anniversary date of the CSU service contract").

Based on the stipulated order and the evidence presented at trial, Xerox's position is untenable. Xerox agreed to the license payment terms set forth in the stipulated order for license fees accruing from and after July 15, 1997, and cannot now claim that CSU's failure to pay license fees on July 15, 1997, constitutes infringement of Xerox's copyrights. No evidence suggests that CSU has breached the terms of its agreement with Xerox or violated the stipulated order. Mr. Watkins, CSU's President and CEO, testified that CSU has issued purchase orders for the license fees accruing after July 15, 1997, and that CSU has paid every bill submitted by

Xerox for the *pro rata* share license fees. *See* Trial Tr. at 111. Xerox concedes that its own accounting procedures have prevented it from accepting several license fee payments by CSU. Moreover, Xerox has not presented any evidence that it intended to preserve its claim against CSU for infringement of its diagnostic software copyrights after July 15, 1997. Xerox certainly could have included such a provision in the stipulated order.

In sum, the court finds that the relevant time period for computing damages on Xerox's copyright infringement claims is from April 1994 through July 15, 1997. CSU agreed to pay license fees accruing from and after July 15, 1997, and has done so in accordance with the parties' agreement. Therefore, Xerox is not entitled to damages after July 15, 1997.[2]

### 2. Xerox's Lost Profits.

█ Xerox presented undisputed evidence that had CSU purchased diagnostic software licenses for its unlicensed 5090 family copiers, Xerox would have earned profits totaling $547,797 after deducting the *pro rata* payments which CSU has agreed to make for the time period from and after July 15, 1997. This sum is recoverable as damages under the Copyright Act. *See* 17 U.S.C. § 504(b).

Xerox also is entitled to recover prejudgment interest on its lost profits. The Tenth Circuit has held that "prejudgment interest is available to plaintiffs under the Copyright Act" and "is ordinarily awarded, absent some justification for withholding it." *Kleier Advertising, Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1041–42 (10th Cir.1990); *see Data General Corp. v. Grumman Sys. Support Corp.*, 825 F.Supp. 340, 347 (D.Mass.1993) (noting that jury awarded prejudgment interest on copyright infringement claims brought by computer manufacturer against ISO), *remanded not in relevant part*, 36 F.3d 1147 (1st Cir.1994). Indeed, CSU recognizes that prejudgment interest is appropriate on unpaid license fees.

No justification for withholding prejudgment interest is present here. Prejudgment interest is necessary to achieve the goal of compensating copyright owners under the Copyright Act. *See Kleier*, 921 F.2d at 1042. "Prejudgment interest is an element of complete compensation" because it "compensate[s] for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *West Virginia v. United States*, 479 U.S. 305, 310 n. 2, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987). Accordingly, the court will award prejudgment interest to Xerox at the prime rate. After adding prejudgment interest and compounding on a daily basis, the present value as of September 3, 1998, of Xerox's lost licensing profits totals $692,137.

### 3. CSU's Profits From Infringement.

█ The purpose of awarding both actual damages and profits is "to prevent the infringer from unfairly benefiting from a wrongful act." 4 *Nimmer on Copyright* § 14.03, at 14–29. Awarding the infringer's profits "makes any would-be infringer negotiate directly with the owner of a copyright that he wants to use, rather than bypass the market by stealing the copyright and forcing the owner to seek compensation from the courts for his loss ..." *Taylor v. Meirick*, 712 F.2d 1112, 1120 (7th Cir.1983).

█ "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Xerox therefore bears the burden of showing CSU's revenue from the sale and service of 5090 family copiers using infringing diagnostic software. On the other hand, CSU bears the burden of establishing the appropriate deductions from that revenue. Any doubts regarding the deductibility of expenses resulting from CSU's failure to properly document its costs must be resolved against CSU, the infringer. *See In Design v.*

---

2. In one instance, a CSU customer did not renew its service contract and CSU accordingly never purchased a license for this copier. Therefore, the court finds it appropriate to allow Xerox to recover CSU's profits from this one service contract until the contract terminated in October 1997. *See* Exh. 405, Serial # 2FK–010545.

*K–Mart Apparel Corp.,* 13 F.3d 559, 564 (2d Cir.1994) (citing *Gaste v. Kaiserman,* 863 F.2d 1061, 1070–71 (2d Cir.1988)); *Playboy Enterprises, Inc. v. Dumas,* 831 F.Supp. 295, 318 (S.D.N.Y.1993), *opinion modified not in relevant part,* 840 F.Supp. 256 (S.D.N.Y. 1993). If CSU fails to carry its burden of showing deductible expenses "or if its attempt to do so is found unacceptable by the court ... then the gross figure is left to stand as the profit factor." *Business Trends Analysts, Inc. v. Freedonia Group, Inc.,* 700 F.Supp. 1213, 1240 (S.D.N.Y.1988), *aff'd in relevant part, rev'd in part,* 887 F.2d 399 (2d Cir.1989).

An incremental expense, as defined under standard principles of cost accounting, is an expense which varies directly with the activity to which it relates over the short term. To be incremental, it is important that the cost vary over the short term, one year or less, rather than the long term, because all costs are variable over the long term. Thus, parts cost is an incremental expense because parts usage varies with service revenue. On the other hand, overhead costs such as the salaries of management, rent, utilities, and the cost of operating a computer system are not incremental because they ordinarily do not vary directly with sales or service revenue.

■ The court agrees with Xerox that fixed costs cannot be deducted in calculating CSU's profits attributable to its infringement. Not all of CSU's "overhead" expenses (titled "SG & A" expenses), however, can be characterized as fixed costs. *See Artmark–Chicago, Ltd. v. E. Mishan & Sons, Inc.,* 26 U.S.P.Q.2d 1201, 1992 WL 265903, at *3 (N.D.Ill. Aug.12, 1992) ("the question is not one of overhead as such but rather of the variable-cost components of overhead"); *see also Adams v. Lindblad Travel, Inc.,* 730 F.2d 89, 93 (2d Cir.1984) ("Simply stated, fixed costs represent the total dollar expense that occurs regardless of output and include such 'overhead' items as an enterprise's commitments for rental and maintenance, depreciation and the like.") (citation omitted). Short-term variable costs, *i.e.,* costs that vary directly in relation to 5090 revenue, are properly deducted in calculating CSU's profits attributable to its infringement. Fixed costs should not be deducted, however, "because

by definition they cannot be avoided by curtailing the profit-making activity." *Taylor,* 712 F.2d at 1121; *see Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 941 (7th Cir.1989) ("Fixed costs are not deducted from the profit calculation."), *cert. denied,* 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990); *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.,* 772 F.2d 505, 516 (9th Cir.1985) ("defendant additionally must show that the categories of overhead actually contributed to sales of the infringing work"); *Sheldon v. Metro–Goldwyn Pictures Corp.,* 106 F.2d 45, 54 (2d Cir.1939) ("[O]verhead which does not assist in the production of the infringement should not be credited to the infringer; that which does, should be."), *aff'd,* 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940); *Hamil Am., Inc. v. SGS Studio, Inc.,* 45 U.S.P.Q.2d 1699, 1998 WL 19991, at *2–3 (S.D.N.Y. Jan.21, 1998) (allowing deduction only for overhead expenses that are incremental); *Banff,* 921 F.Supp. at 1070 (noting that incremental approach is consistent with the Second Circuit's reasoning in *Sheldon* ); *Playboy Enterprises,* 831 F.Supp. at 318 (denying deduction of expenses which did not increase as a result of the infringement); *Wildlife Express Corp. v. Carol Wright Sales, Inc.,* No. IP 89–844–C, 1992 WL 597841, at *4 (S.D.Ind. Aug.13, 1992) (fixed costs are not deductible), *aff'd,* 18 F.3d 502 (7th Cir.1994); *JBJ Fabrics, Inc. v. Mark Indus., Inc.,* 5 U.S.P.Q.2d 1414, 1987 WL 47381, at *6 (C.D.Cal. Nov.5, 1987) (general overhead is not deductible).

■ The court finds that the deductibility of CSU's fixed overhead costs does not depend on whether CSU's infringement was willful or not. *See Taylor,* 712 F.2d at 1121–22 (deduction allowed only for incremental expenses with no discussion of a distinction between willful and non-willful infringement); *see also Frank Music,* 772 F.2d at 515–16 (deduction of overhead by non-willful infringer allowed if the categories of overhead actually contributed to sales of the infringing work); *Sheldon,* 106 F.2d at 54 (allowing deduction of overhead which assists in the production of. the infringement in case of willful infringer). In either case, the court finds that CSU is not entitled to deduct its fixed costs because CSU has failed to meet

its burden of establishing a sufficient nexus between each expense and 5090 revenue and offering a fair and acceptable formula for allocating these expenses to 5090 revenue. *See, e.g.,* Exh. 2 n. 14 ("Miscellaneous expenses and contributions are general and non specific expenses that support all activities, including 5090s."); Trial Tr. at 218–19 (Mr. Lyon testified that some SG & A categories are overstated and some are understated by allocation but "it would all come out in the wash.").

Although the court has framed its inquiry in accounting terms, CSU is not required to directly allocate its costs or prove its costs with absolute certainty, "reasonable approximations constitute satisfactory evidence." *Cambridge Institute, Inc. v. Oxford Group, Inc.,* 53 F.3d 342, 1995 WL 265929, at *3 (10th Cir. May 8, 1995) (quoting *K–Mart,* 13 F.3d at 564). Nevertheless, the court will not base its conclusion on mere guesswork or an assumption that all of CSU's expenses will "come out in the wash." *See Cambridge Institute,* 1995 WL 265929, at *3 (citing *Pfanenstiel Architects, Inc. v. Chouteau Petroleum Co.,* 978 F.2d 430, 432 (8th Cir. 1992)). At a minimum, CSU "must carry the burden of demonstrating a sufficient nexus between each expense claimed and the sales of the unlawful goods," and "of further offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing item in issue." *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1, 8 (2d Cir.1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990); *K–Mart,* 13 F.3d at 565–66. The determination of CSU's deductible expenses is an issue of fact. *See Cambridge Institute,* 1995 WL 265929, at *3.

We find that four of CSU's SG & A expenses are properly deductible—travel/entertainment, auto, postage/freight, and moving expenses. CSU has established that each of these expenses contributed to the production of 5090 revenue and CSU has offered a fair and acceptable formula for allocating a portion of these expenses to its 5090 revenue. All of these expenses vary with the amount of 5090 revenue and total revenue of CSU. The court adopts the percentage of revenue approach to allocate these four expenses, *i.e.,* the court has multiplied each of these ex-

penses for each fiscal year by the percentage that unlicensed 5090 revenues bear to total company revenues. Accordingly, the amount of $28,628 for FY 1995, $58,330 for FY 1996, and $80,129 for FY 1997 should be deducted from CSU's gross profits as incremental SG & A expenses attributable to 5090 revenue.

On the other hand, after resolving all doubts regarding CSU's failure to present adequate proof of its costs in favor of Xerox, we find that CSU's remaining SG & A expenses are not properly deductible. CSU has not shown that each of these remaining expenses contributed to 5090 revenue. First, a number of the general expense categories do not correlate with either CSU's total revenue or CSU's 5090 revenue. *See* Exh. 2: insurance, taxes and licenses, accounting and legal, management fees, contract labor, telephone and communications, supplies, tools, contributions, bad debts, and miscellaneous. Based on the evidence presented at trial, these expenses do not appear to be short-term variable costs. For example, CSU's taxes and licenses, accounting and legal, management, telephone and communications, tools, and miscellaneous expenses all decreased from FY 1995 to FY 1996, yet CSU's total revenue increased 25% and CSU's 5090 revenue increased 65% during the same time period. While there may be some explanation for how a short-term variable expense could decrease while revenue increases (*e.g.,* a major price decrease in CSU's supplies), none was presented at trial. Accordingly, these expenses are not properly deductible.

Next, the court finds that nearly all of the SG & A expenses are truly fixed costs based on the trial testimony and common sense. *See* Exh. 2. We look at only a few of the expenses to illustrate why deduction of a portion of these expenses would be inappropriate. CSU did not establish that its rent expenses were variable in the short term. CSU was in the same space in Kansas City between 1992 and 1997 as its revenue attributable to 5090s grew from nothing to more than $2.4 million per year. *See* Trial Tr. at 189–91; Exh. 405. With respect to management fees, CSU concedes that this expense charged by its chairman, Paul Lyon, and by James Pace, a member of CSU's board of

directors, is entirely unrelated to the 5090 and should not be deducted. *See* Trial Tr. at 144–45, 174, 191. CSU also concedes that a significant portion of its telephone and communications expense—at least $19,000 per year—is a fixed cost. *See id.* at 193–94. Next, CSU's accounting expense includes its payments to ADP to maintain CSU's payroll and CSU's payments to an accounting firm for an annual audit, expenses that certainly do not vary in the short term in relation to revenue. *See id.* at 172. CSU's utilities expense includes water, sewer, trash, and electric bills. *See id.* at 173. No evidence suggests that these utility bills varied in relation to 5090 revenue. CSU's supplies expense included miscellaneous office supplies such as letterhead and note pads, again an expense that does not vary in relation to revenue. *See id.* at 178. Finally, CSU has not shown that its charitable contributions were related to its 5090 revenue. *See id.* at 269. Even if CSU could establish such a relationship, CSU cannot voluntarily reduce its profit—the amount it must pay Xerox—by making charitable contributions which benefit CSU's entire business.

In light of the court's conclusion that CSU has failed to establish that the remainder of its SG & A expenses are directly related to the production of 5090 revenue, the court concludes that any attempt to allocate these expenses would be mere guesswork and speculation. Although the determination of whether certain expenses are deductible is highly fact intensive, our conclusions here are consistent with the findings of several other courts which have held that rent, utilities, phone service, management fees, and contributions are not deductible. *See Taylor*, 712 F.2d at 1121 (rent and basic phone service generally are fixed costs); *Wildlife Express*, 1992 WL 597841, at *4 ("Fixed costs like rent, utilities, and the like, here lumped together by Defendant as 'overhead' are not deductible."); *JBJ Fabrics*, 1987 WL 47381, at *6 (management, rent, and telephone expenses treated as fixed costs and therefore not deducted); *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 508 F.Supp. 798, 801 (S.D.N.Y.1981) (denying deductions for "management fee, legal and professional fees, certain salaries, certain telephone ex-

penses"), *decision modified not in relevant part*, 722 F.2d 988 (2d Cir.1983).

CSU did present evidence at trial that its bad debt expense for FY 1998 was $47,000, all of which was attributable to 5090 revenue. *See* Trial Tr. at 121. Only 3.5 months of FY 1998, however, are included in the court's damage calculation. Therefore, the court will deduct only $13,708 as an expense attributable to unlicensed 5090 revenue. CSU was unsure if any of its bad debts from prior years were related to the 5090, so the court has not deducted any portion of CSU's bad debt expense for prior years. *See id.* at 121. CSU failed to present any other itemized expenses for FY 1998 and, therefore, CSU is not entitled to any other deduction for SG & A expenses from April 1, 1997, to July 15, 1997.

The Tenth Circuit in *Kleier* did not draw any distinction between an award of prejudgment interest on the copyright owner's damages and an award of damages on the infringer's profits. 921 F.2d at 1041. An award of prejudgment interest on CSU's profits is required to prevent CSU from benefiting from its unlawful acts and to deter future infringement, because the interest that accrues on CSU's profits is another form of indirect profit attributable to CSU's infringement. *See Frank Music Corp. v. Metro–Goldwyn Mayer, Inc.*, 886 F.2d 1545, 1552 (9th Cir.1989), *cert. denied*, 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990); *see also* Jon M. Powers, Comment, *The Copyright Act of 1976 and Prejudgment Interest*, 94 Mich.L.Rev. 1326, 1337 (Mar.1996) (prejudgment interest should be awarded on infringer's profits). Accordingly, it is necessary to award prejudgment interest on CSU's profits attributable to its infringement. Including this prejudgment interest, CSU's profits attributable to its infringement total $347,145.

In sum, Xerox is awarded the total amount of $1,039,282 as damages for CSU's infringement of Xerox's copyrights for its 5090 diagnostic software.

## B. Attorneys' Fees.

A court in its discretion may award costs and attorneys' fees to the party

prevailing on a copyright claim. *See* 17 U.S.C. S 505. " 'There is no precise rule or formula for making these determinations,' but instead equitable discretion should be exercised." *Fogerty v. Fantasy,* 510 U.S. 517, 534, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 436–437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). The Supreme Court has noted several nonexclusive considerations to guide district courts in exercising their discretion including: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *See Fogerty,* 510 U.S. at 535 n. 19, 114 S.Ct. 1023 (quoting *Lieb v. Topstone Indus., Inc.,* 788 F.2d 151, 156 (3d Cir.1986)). CSU has not raised any objection to an award of attorneys' fees in this case. The court finds that an award of attorneys' fees in this case would serve to make Xerox whole, to deter infringement, to dissuade CSU's "disdain for copyright laws, and to encourage the assertion of colorable copyright claims." *Big Tree Enterprises, Ltd. v. Mabrey,* 1994 WL 191996, at *8 (D.Kan. April 15, 1994) (J. Crow) (citing *Chi–Boy Music v. Charlie Club, Inc.,* 930 F.2d 1224, 1230 (7th Cir.1991)), *aff'd,* 45 F.3d 439, 1994 WL 721413 (10th Cir. Dec.29, 1994). Xerox shall serve and file its motion for attorneys' fees within 30 days. Counsel for Xerox shall consult with counsel for CSU and attempt to reach an agreement regarding the fee award. *See* D.Kan. Local Rule 54.2.

IT IS THEREFORE ORDERED that judgment shall be entered in favor of Xerox and against CSU on Xerox's copyright infringement counterclaim in the amount of $1,039,282.

IT IS FURTHER ORDERED that all pending motions in limine shall be denied as moot.